(141 P.3d 1192)
No. 95,650

JOHN ELLIOTT GRAHAM, *Appellee*, v. DOKTER TRUCKING GROUP, SOLDIER CREEK TRANSPORTATION, UNION INSURANCE COMPANY, and CONTINENTAL WESTERN INSURANCE COMPANY, *Appellants*.

Opinion filed September 1, 2006.

*Nathan Burghart,* of Fairchild & Buck, P.A., of Lawrence, for appellants.

*Frederick J. Patton, II,* of Patton and Patton, Chartered, of Topeka, for appellee.

Before RULON, C.J., GREEN and GREENE, JJ.

GREENE, J.: John Graham's employer, Dokter Trucking Group and Soldier Creek Transportation, together with its insurers, Union

Insurance Company and Continental Western Insurance Company, appeal the award of work disability benefits to Graham by the Workers Compensation Board (Board), arguing that Graham failed to prove a wage loss because his purported inability to work a 40-hour week was not substantiated by a physician's restriction, but rather was the result of a self-imposed "restriction" due to reported pain. Concluding that the material statute requires a physician's opinion in support of such an award and that Graham failed to establish that his post-injury wages were not consistently less that 90% of his preinjury wages, we reverse.

*Factual and Procedural Background*

Graham was an over-the-road truck driver, who fell from a truck trailer and sustained injuries to his neck, right arm, and right leg. After being released by his chiropractor, Graham attempted to return to work but after 6 months determined that, due to pain, he could no longer perform his prior job, which included climbing to the top of the trailer, pulling a large heavy hose with him, and cleaning the trailers.

As a result of Graham's situation, his employer fully accommodated him by reassigning him to drive for a different contract carrier who required no climbing or lifting. Moreover, the new carrier utilized "air ride" trucks and there was less "jostling around." Nevertheless, Graham again left work due to pain.

After 6 months, Graham returned to work at the second carrier, but restricted his work week to less than full time ("2 or 3 days") due to pain he reported experiencing after checking both side mirrors every 5 to 8 seconds. His work at the second carrier paid 40% more per mile, thus allowing him to exceed his preinjury wages if he worked a full week.

The parties agree that the record contains no physician's opinion expressly restricting Graham's work due to his injury. It is also beyond dispute, however, that both physicians who testified confirmed that Graham's pain is consistent with his injury. Both parties rely on the testimony of Dr. Chris Fevurly who examined Graham and determined he had a 15% functional impairment to his cervical

spine. Regarding restriction of work, Fevurly testified any work restriction was "self-imposed."

The administrative law judge (ALJ) found that although Graham was performing his tasks as a truck driver, he could no longer do so full-time. The ALJ determined Graham had a 43% task loss and a 24% wage loss. As a result, Graham suffered a 33.5% work disability. The employer and its insurers sought review with the Board.

After its review of the record, the Board affirmed the ALJ's award, concluding in material part:

"It is acknowledged in this record that while claimant is performing the same tasks he was performing at the time of the injury, he has limited himself to, because of pain from this injury, 20 hours a week and is, therefore, not performing the tasks as repetitiously or to the same degree as before. Both Dr. Zimmerman and Dr. Fevurly agreed claimant's pain is consistent with his injuries. Moreover, Dr. Fevurly noted if claimant was expected to work 40 hours per week, he would need time off in the middle of the week to recuperate. Lastly, there was no testimony claimant was faking his pain or lack of ability to work full-time. The Board finds the opinion of Dr. Zimmerman to be more credible and affirms the ALJ's determination that claimant has suffered a task loss of 43 percent."

Two Board members dissented, and one of the dissenters stated:

"This Board Member acknowledges that Dr. Fevurly did testify that if claimant is able to work 20 hours a week, but not the second 20 hours, then he would say that claimant in incapable of coping with the pain and unable to perform the job tasks for that second 20 hours. However, Dr. Fevurly went on to testify that he thinks claimant is qualified to work as many hours and drive as many miles as he did prior to his injury and the restriction at 20 hours per week is not a medical restriction, but a self-imposed restriction utilized by claimant."

The employer and its insurers appeal.

*Did the Board Err in Awarding Graham Work Disability Based in Part on His Self-Imposed Restriction Due to Pain?*

The employer and its insurers claim the Board erred in affirming the ALJ's award of work disability because Graham did not suffer a wage loss. They argue that a self-imposed restriction on hours worked should not justify a wage loss where the employer has fully accommodated the employee and no physician has imposed a work restriction.

We review decisions of the Board in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions. *Garrison v. Beech Aircraft Corp.*, 23 Kan. App. 2d 221, Syl. ¶ 3, 929 P.2d 788 (1996). We review de novo the Board's interpretation of a controlling statute. See *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 283, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

Insofar as the parties and this court can determine, this appeal presents a question of first impression: Is a worker entitled to a work disability award where he or she has been fully accommodated by his employer but self-imposes a work restriction that is not supported by the opinion of a physician? Clearly, we do not and cannot quarrel with the Board's findings that Graham experienced actual pain that prohibited him from working a 40-hour week without taking some time off between work periods. We reverse the award of work disability, however, for two reasons: (i) We conclude that the controlling statute contemplates that a wage loss must be supported by an opinion of a physician; and (ii) the record does not support the Board's finding of a wage loss because Graham was engaging in work for wages equal to his preinjury wages.

## Self-imposed work restrictions by an accommodated employer do not support a claim of wage loss.

The controlling statute is K.S.A. 44-510e(a), which states in material part:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury."

Here, there is no question that the employer accommodated Graham by the reassignment to a second carrier where the tasks were more easily performed by Graham given his task losses. In fact, we understand the employer's argument to be that the accom-

modation allowed Graham to continue working despite the task losses that were supported by physician testimony. Unfortunately for Graham, no physician was willing to restrict his postinjury employment, except to say that his reported pain was consistent with his injury. Dr. Fevurly was particularly equivocal as to any work restriction.

"Q. And, Doctor, did you place any restriction on Mr. Graham against working a full 40-hour week or as many hours as he had prior to this injury?

"A. No, I didn't put a restriction on him. You know, he is—he reports that he can only cope or tolerate 20 hours per week. However, he is able to do the job as outlined. . . .

. . . .

"Q. As far as you're concerned, he can work as many hours and drive as many miles as he was prior to this injury?

"A. Well, I think he's qualified to do that. . . .

"Q. And when we say 'restriction of 20 hours per week,' that's not a restriction— a medical restriction?

"A. Right. He's kind of self-imposed that in order to continue to work. And as I say this is a reported intolerance to the performance of more hours.

"Q. Okay. And that's not a restriction that's been placed upon him by you or any other physician as far as you know?

"A. Well, I didn't place it on him."

Did the legislature intend that an accommodated employee should receive a work disability award when unable to work full-time based upon reported pain and self-imposed work restrictions? We think not. The statute includes the all-important phrase, "in the opinion of a physician," as required to support the loss of "work tasks." The obvious reason for a two-prong formula for the work disability award is to take into consideration not only the percentage of task loss, but also the effect *of such loss* on wage earning capability. Where the wage earning capability is based solely on pain, albeit actual pain, we do not believe the legislature intended a work disability award.

In support of our reasoning, we consider a situation where there is submitted absolutely no opinion of a physician to support work restriction or wage loss. Would a work disability award be permitted solely due to the accommodated worker's reported inability to return to work based on reported pain? Again, we think not. The

only way for the statute to make sense is to interpret a physician's opinion as critical to the award, and that opinion must buttress an actual work restriction that gives rise to the wage loss. Statutes must be construed to avoid unreasonable results. See *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 88, 106 P.3d 492 (2005). If we were to construe the statute as did the Board, we believe the result would open the door to a myriad of work disability awards based solely on purely subjective factors, and this cannot be consistent with legislative intent underpinning K.S.A. 44-510e(a). As this court has said before, "[t]he legislature clearly intended for a worker not to receive compensation where the worker was still capable of earning nearly the same wage." *Foulk*, 20 Kan. App. 2d at 284. We have consistently refused to support work disability awards where the worker has *chosen* to suffer a wage loss. See, e.g., *Lowmaster v. Modine Mfg. Co.*, 25 Kan. App. 2d 215, 962 P.2d 1100, *rev. denied* 265 Kan. 885 (1998).

The two-part test for measuring work disability includes both a measurement of the loss of ability to perform work tasks and actual loss of wages *resulting from the worker's disability*. *Gadberry v. R.L. Polk & Co.*, 25 Kan. App. 2d 800, 802-03, 975 P.2d 807 (1998). Where a loss in wages results from an accommodated worker's self-imposed work restriction rather than a physician's opinion, this wage loss is not compensable under the controlling statute.

### Work disability award prohibited where worker is engaging in work for wages equal to 90% of preinjury wages

As an alternative ground for our conclusion we note that the record does not support Graham's contention that he was unable to earn at least 90% of his preinjury average weekly wage. The controlling statute contains an express prohibition on a work disability award where the worker is "engaging in any work for wages equal to 90% or more of the average [preinjury wage]." Here, the accommodated position with a second carrier was paid at a rate 40% above the preinjury wage. Accordingly, in order to earn at least 90% of his preinjury wage, Graham did not need to work a full 40-hour week, but rather needed to work only 26 hours per week. The testimony in the record does not support any conclusion

that Graham was unable to work 26 hours a week at the accommodated position.

Graham testified that regulatory authorities allowed him to drive 70 hours in 8 days, which means that in a 7-day week, Graham was permitted to work 61.25 hours. He then said that he "would like to be working six days a week if [he] could . . . instead of two or three." He also said, "[I]f it's an easy run I can maybe work three days." He conceded on cross-examination that he "could earn twice as much now if I could, but I—that's why what I make in three days is—a couple of days is—keeps the wolf away from the door."

Examining wage records, it is clear that it was not unusual for Graham to earn at least 90% of his preinjury wage after he returned to the accommodated work at the second carrier. The Board found that Graham's preinjury average weekly wage was $498.36, and 90% of this amount (the threshold necessary for a work disability award) was therefore $448.52. During the period June 12, 2003, to September 25, 2004 (the same period examined by the Board), Graham earned more than $448.52 in 23 of 60 weeks, and he earned more than $440 in 31 of 60 weeks.

We believe that this illustrates the problem with Graham's argument. If a work disability award can be based purely on reported pain, it is possible for the worker to manipulate his or her workweek to assure that, *on average*, the postinjury weekly wage will not exceed the 90% of preinjury wage that would make the worker ineligible for the award, even though the worker demonstrates a clear ability to earn the 90% any time desired.

Here, we are faced with a need to construe the phrase "is engaging" contained within the legislative prohibition. The statutory language states:

"An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee *is engaging* in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury." (Emphasis added.) K.S.A. 44-510e(a).

Although K.S.A. 44-511 provides standards and a formula for calculating "average gross weekly wage," there is no further statutory nor regulatory guidance for construing the phrase "is engag-

ing." Although this determination may be suited for a agency application on a case-by-case basis, we are not satisfied here that Graham should escape the statutory prohibition because he is consistently "engaged" in work for wages equal to 90% or more of his preinjury wages. We have previously recognized that since the 1993 amendment to K.S.A. 44-510e(a), the phrase "as long as" within the statutory prohibition implies an ongoing rather than a one-time or averaged examination. See *Roskilly v. Boeing Co.*, 34 Kan. App. 2d 196, 201, 116 P.3d 38 (2005). Consistent with this reasoning, a fully accommodated worker who has consistently demonstrated the ability to earn at least 90% of his or her preinjury wages over a 60-week period is ineligible for work disability.

We hold that in applying the legislative prohibition on work disability awards, a fully accommodated worker shall be deemed ineligible where his or her work restrictions are not supported by an opinion of a physician, or where the worker with a reported pain restriction has demonstrated the ability to earn at least 90% of his or her preinjury wage during many if not most of the weeks within the postinjury period under examination.

We reverse the Board's award of work disability to Graham and remand with directions to limit his award to functional impairment.

*Did the Board Err in Awarding Reimbursement of Dr. Seeman's Medical Care as that of Authorized Treating Physician?*

The employer and its insurers next argue that the Board erred in obligating them to pay for certain prescriptions from Dr. Seeman, arguing that he was not the current authorized treating physician, arguing that Graham performed an "end around" the procedural requirements of the Workers Compensation Act.

The Board found against the employer and its insurers on this issue, reasoning:

"K.S.A. 44-510h makes it the duty of the employer to provide services of a health care provider as may be reasonably necessary to cure and relieve the employee from the effects of the injury. In this instance, claimant contacted respondents on two separate occasions in January and March of 2004, attempting to obtain authorized care. No response was forthcoming. Claimant contacted respondents and was referred to Dr. Seeman, a doctor well-known to respondent Soldier Creek and used on may occasions for various medical purposes. The in-

surance company, through its attorney, later objected, attempting to appoint Dr. Fevurly as the authorized treating physician and to de-authorize Dr. Seeman.

"The Kansas Supreme Court in *Matney [v. Matney Chiropractic Clinic*, 268 Kan. 336, 995 P.2d 871 (2000)] was asked whether the employer or the insurance company has the right to designate the treating physician. . . .

"The Kansas Supreme Court, in reversing both the Kansas Court of Appeals and the Workers Compensation Board, ruled that it is the respondent's obligation and right under the statute to appoint the designated treating physician. In discussing the language of K.S.A. 44-532(a), which states '[w]here the payment of compensation of the employee . . . is insured by a policy or policies, at the expense of the employer . . . , the insurer . . . shall be subrogated to the rights and duties under the workers compensation act of the employer so far as appropriate . . . .', the Kansas Supreme Court determined that a corporation is a separate entity, authorized under the law to act as a single person distinct from the shareholders who own it. The Court found that the employer is authorized under K.S.A. 1992 Supp. 44-510(a) (the predecessor to K.S.A. 44-510h) to designate a treatment provider for the employee. The Kansas Supreme Court found that the clinic (respondent) in *Matney* acted within its statutory authority when designating Dr. Fore as its employee's (Matney's) treating provider. The insurance carrier was then ordered to pay the charges for the treatment provided by Dr. Fore.

"In this instance, the Board finds, based on *Matney*, that the designation by respondent Soldier Creek of Dr. Seeman as the authorized treating physician qualifies under K.S.A. 44-510h as appropriate medical care and that authorization obligates the employer (and its insurance carrier) to pay for the treatment and the medications prescribed by Dr. Seeman."

We note that the ALJ noted that "it's been a pretty sloppy presentation by both sides" on this issue. We adopt the reasoning of the Board and agree that, under these circumstances, the respondent indeed authorized Dr. Seeman, and the Board did not err in awarding reimbursement of certain prescription costs resulting from his treatment. See *Winters v. GNB Battery Technologies*, 23 Kan. App. 2d 92, 97, 927 P.2d 512 (1996). We affirm the Board on this issue.

In summary and conclusion, we reverse the Board's award of work disability to Graham, we affirm the Board's award of reimbursement of the Seeman related medical costs, and we remand with directions to limit the award to functional impairment.

Affirmed in part, reversed in part, and remanded with directions.