No. 95,650

JOHN ELLIOTT GRAHAM, *Appellee*, v. DOKTER TRUCKING GROUP, SOLDIER CREEK TRANSPORTATION, UNION INSURANCE COMPANY, and CONTINENTAL WESTERN INSURANCE COMPANY, *Appellants*.

(161 P.3d 695)

Opinion filed July 13, 2007.

*Nathan D. Burghart,* of Fairchild & Buck, P.A., of Lawrence, argued the cause, and *Jack J. Hobbs,* of the same firm, was with him on the briefs for appellants.

*Frederick J. Patton II,* of Patton and Patton, Chartered, of Topeka, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal calls upon us to decide the necessity of a physician's opinion to support the existence of a compensable wage loss under K.S.A. 44-510e(a) and to evaluate the sufficiency of evidence to support the Workers Compensation Board's assessment of wage loss and thus permanent partial general disability award in this particular case.

### Factual and Procedural Background

Claimant John Elliott Graham is a trucker who fell from a trailer in February 2002, injuring his right arm, right leg, and neck. Graham notified his employers, respondents Soldier Creek Transpor-

tation and Dokter Trucking, of his injury and his workers compensation claim. Claimant received temporary total disability benefits until released to return to work without restrictions the next month.

Claimant attempted to perform his job duties but was prevented from doing so adequately by headaches and persistent neck pain. After 6 months with no improvement in his condition, claimant saw Dr. Bernard Poole, who took claimant off work. Again, claimant received temporary total disability benefits until he returned to work without restrictions the following month.

After 2 days of work—including loading, handling hoses to fill and clean trailers, and other tasks on the ground—claimant and his boss, the sole owner of Soldier Creek, decided "it just wasn't going to work," and claimant was sent home.

Claimant returned to work with full accommodations in early January 2003. The accommodations consisted of reassignment to drive for a different carrier, Federal Express (FedEx), for whom claimant was not required to do any lifting or climbing. In addition, FedEx used "air ride trucks," meaning less "jostling around" while claimant was driving. Despite these accommodations, pain again forced claimant to leave work 2 weeks later.

The following June, claimant returned to work at his FedEx assignment. However, he restricted his work week to 2 or 3 days because of pain. Soldier Creek accommodated this schedule, allowing claimant to work for as long as he could tolerate the discomfort it caused.

At claimant's December 2004 hearing on his eligibility for a permanent partial general disability award, the parties introduced expert testimony by way of the depositions of vocational consultant Michael J. Dreiling and of Dr. Daniel Zimmerman. In addition, Dr. Chris Fevurly was deposed after the hearing, and his testimony was added to the hearing record.

Dreiling had reviewed claimant's medical records and interviewed him before preparing an "Essential Task Performing Analysis." Based on what Dreiling had learned about claimant's work history and the duties claimant had been responsible for during the previous 15 years, the report set out seven essential tasks. However, it also reflected that the FedEx job required claimant to per-

form only two of the seven: truck driving and logbook maintenance. Dreiling testified that claimant was able to do these two tasks, although he was doing them only part-time.

Dreiling also testified that claimant had no work restrictions and that, if there were no restrictions on a patient, one ordinarily would assume the patient was able to perform all of his or her essential job tasks. In this case, however, given claimant's report of pain and Poole's and Zimmerman's expressions of concern about claimant's lifting capacity and pain tolerance, Dreiling opined that it would be best if claimant's tasks did not include tarping, loading, unloading, and other work on the ground. Dreiling also suggested that, although claimant might be able to find a medium-duty, unskilled job, he would be "essentially and realistically unemployable" if he could not continue his career as a truck driver.

Zimmerman examined claimant at the request of claimant's counsel on December 5, 2002. Based on Dreiling's report, claimant's medical records, and Zimmerman's own interview and examination of claimant, Zimmerman opined claimant had a 43 percent task loss. Zimmerman also testified that claimant had sustained an 18 percent functional impairment due to cervical spine injury, based on the American Medical Association's Guides to the Evaluation of Permanent Impairment, 4th edition. Zimmerman admitted that he had not used diagnosis-related estimate (DRE) models to reach the 18 percent figure; if he had, the figure would have been lower. He further opined that claimant's reduced ability to rotate his neck would affect his ability to drive a commercial truck significantly. He also testified that he did not restrict claimant from working less than 40 hours per week or driving a truck full time but that, hypothetically, claimant's pain could incapacitate him totally. Zimmerman testified that he would restrict claimant's lifting.

Two years after Zimmerman conducted his examination, claimant saw the insurance carrier's designated physician, Fevurly. Fevurly based his opinions on the claimant's medical records and his own interview and examination of claimant. He testified that, based on DRE models and American Medical Association guides, claimant had sustained a 15 percent functional impairment, appropri-

ately apportioned 5 percent to preexisting degenerative changes and 10 percent to the work injury. Fevurly also opined that claimant was able to do all of the essential tasks of his accommodated job and that there was no restriction against claimant working a 40-hour week. He conceded that, if claimant was having debilitating pain for 20 hours of a 40-hour week, his condition would qualify as a disability; but, in his view, it still would not require a medical restriction to a 20-hour week.

Claimant's testimony and other evidence established that, before his accident, he was making $.25 a mile. Once assigned to FedEx, he was making $.35 a mile, *i.e.*, 40 percent more for each mile driven. However, because pain kept him from working full-time, he was not earning as much in the aggregate as he was earning before his injury. FedEx had the same number of miles available for claimant to drive, and no doctor had imposed restrictions on claimant's miles or on his hours of driving.

The administrative law judge (ALJ) found that claimant's preinjury average weekly wage was $498.36. Noting the existence of contradiction, duplicity, and inconsistency in the evidence, he ultimately found that claimant's weekly wage after the injury was $321.32. This figure was based on the wages earned between June 12, 2003, and September 25, 2004, when claimant was working part-time on a regular basis; and it supported calculation of a 24 percent wage loss under K.S.A. 44-510e.

The ALJ also specifically found that claimant "does not retain the capacity to work a normal five day work-week." He based this finding on Fevurly's testimony that, if an employer needed claimant to work 40 hours a week, claimant should be allowed a day or two off in the middle of the week to recuperate. The ALJ acknowledged Fevurly's assessment that claimant had no task loss, but he found that claimant's inability to work a regular 40-hour week meant he was not performing the tasks to the same degree. Citing *Brenda A. Golden v. Hygienic Dry Cleaners*, Workers Compensation Board docket No. 1,003,588 (October 2003), for the proposition that "assessment of task loss must consider the tasks as they were preformed by the employee," the ALJ found, agreeing with Zimmerman, that claimant had suffered a 43 percent task loss.

Averaging the 24 percent wage loss and 43 percent task loss as required by K.S.A. 44-510e(a), the ALJ concluded claimant had a 33.5 percent permanent partial general disability.

The ALJ also relied on Fevurly's cervical impairment testimony, discounting his attribution of 5 percent of the total 15 percent to preexisting degenerative changes because the changes were asymptomatic before the accident. The ALJ found a 15 percent functional impairment.

The ALJ's findings resulted in an award of 4.43 weeks of temporary total disability compensation at $332.57 per week, or $1,473.29; and 139.03 weeks of 33.5 percent permanent partial general disability at $332.57 per week, or $46,237.21.

Respondents appealed to the Workers Compensation Board. A three-member majority adopted the ALJ's findings and conclusions and affirmed.

The majority held the ALJ correctly found that the claimant's preinjury average weekly wage was $498.36 and that he had earned a total of $12,957.36 during the 26 weeks before the accident. Thus, with regard to wage loss, the Board majority agreed that claimant was earning less than 90 percent of his preinjury wages. It said the record supported the ALJ's finding that, from June 12, 2003, to September 25, 2004, claimant earned $25,658.74, an average weekly wage of $381.32, representing a 24 percent wage loss.

Regarding task loss, the majority noted the conflicting Zimmerman and Fevurly opinions, both based on the task list created by Dreiling. It also noted that the physicians agreed claimant's pain was consistent with his injury and that there was no evidence claimant was malingering. The Board agreed with the ALJ's assessment that Zimmerman was more credible on this point and affirmed the 43 percent task loss determination.

Under the definition of functional impairment in K.S.A. 44-510e, the Board also agreed with the ALJ's reliance on Fevurly's overall rating of a 15 percent impairment.

One Board member dissented with regard to whether claimant put forth a good faith effort to obtain employment after his injury. That member regarded the absence of medical restrictions as proof that claimant was able to work 40 hours per week. If he were doing

so, he would be earning wages equal to 90 percent or more of his preinjury amount and therefore was not entitled to a permanent partial general disability award. Rather, he should be limited to an award tied to his functional impairment rating.

A second Board member dissented on an issue not contested in this appeal.

Respondents appealed to the Court of Appeals, arguing, *inter alia*, that the first dissenting Board member correctly interpreted the statute governing the award of permanent partial general disability. In a unanimous opinion, a panel of our Court of Appeals reversed this aspect of the Board's majority decision. *Graham v. Dokter Trucking Group*, 36 Kan. App. 2d 521, 141 P.3d 1192 (2006) (*Graham I*). It held that, when a wage loss results from an accommodated worker's self-imposed work restriction rather than a medical restriction, it is not compensable under K.S.A. 44-510e(a), and claimant should be limited to an award based on his or her functional impairment rating. 36 Kan. App. 2d at 526. "[T]he controlling statute [K.S.A. 44-510e(a)] contemplates that a wage loss must be supported by an opinion of a physician." 36 Kan. App. 2d at 524. Further, the panel held that "the record does not support the Board's finding of a wage loss because [claimant] was engaging in work for wages equal to his preinjury wages." 36 Kan. App. 2d at 524.

We granted claimant's petition for review.

### Standard of Review

This court's scope of review in regard to questions of fact is statutorily defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* The provisions of K.S.A. 77-621(c)(7) provide that this court shall grant relief only if an "agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole." Substantial evidence in the workers compensation context is evidence possessing something of substance and relevant consequence to induce conviction that an award is proper; it furnishes a basis of fact from which an issue can be resolved reasonably. We review

the evidence in the light most favorable to the prevailing party and do not reweigh competing evidence or assess credibility of witnesses. *Neal v. Hy-Vee, Inc.,* 277 Kan. 1, 16-17, 81 P.3d 425 (2003); *Mudd v. Neosho Memorial Regional Med. Center,* 275 Kan. 187, 191-92, 62 P.3d 236 (2003). The Board's findings will be upheld if supported by substantial evidence even though other evidence in the record would have supported contrary findings. *Webber v. Automotive Controls Corp.,* 272 Kan. 700, 705, 35 P.3d 788 (2001).

Appellate determination of whether the Board's findings of fact are supported by substantial competent evidence raises a question of law. *Mudd,* 275 Kan. at 191.

To the extent this appeal involves statutory interpretation, this court has stated that "interpretation of a statute is a necessary and inherent function of an agency in its administration or application of that statute" and that "the interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to great judicial deference." *Mitchell v. Liberty Mut. Ins. Co.,* 271 Kan. 684, Syl. ¶ 4, 24 P.3d 711 (2001). In recent decisions, however, we have been reluctant to apply this doctrine of operative construction when faced with questions of law on undisputed facts. See *Fieser v. Kansas Bd. of Healing Arts,* 281 Kan. 268, 270-71, 130 P.3d 555 (2006). Rather, we have held that the determination of an administrative body on a question of law on undisputed facts is not conclusive. While persuasive, it is not binding on the court. See, *e.g., Fieser,* 281 Kan. at 270; *Foos v. Terminix,* 277 Kan. 687, 692-93, 89 P.3d 546 (2004).

When a statute is plain and unambiguous, we must give effect to its express language, rather than determine what the law should or should not be. We will not speculate on legislative intent and will not read the statute to add something not readily found in it. If the statute's language is clear, there is no need to resort to statutory construction. *Steffes v. City of Lawrence,* 284 Kan. 380, Syl. ¶ 2, 160 P.3d 843 (2007); *Perry v. Board of Franklin County Comm'rs,* 281 Kan. 801, 809, 132 P.3d 1279 (2006).

### The Statute

K.S.A. 44-510e(a) governs workers compensation for temporary or permanent partial general disabilities. It sets out the method for

computing the extent of a permanent partial general disability, defines functional impairment, and limits disability awards in certain situations. It states, in pertinent part:

"Permanent partial general disability exists when the employee is disabled in a manner which is partial in character and permanent in quality and which is not covered by the schedule in K.S.A. 44-510d and amendments thereto. The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. In any event, the extent of permanent partial general disability shall not be less than the percentage of functional impairment. . . . An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury." K.S.A. 44-510e(a).

## Analysis

Two preliminary matters deserve attention.

First, the claimant suggests that the Court of Appeals was precluded from interpreting K.S.A. 44-510e(a) because it had previously held in *Roskilly v. Boeing Co.*, 34 Kan. App. 2d 196, 201, 116 P.3d 38 (2005), that "the language of the statute . . . is clear and unambiguous, leaving no room for judicial construction. [Citation omitted.]"

Such a holding does not preclude a court from revisiting the language of the statute when addressing a completely unrelated issue arising in a new case. The issue here—whether a permanent partial disability finding must be supported by a physician's opinion—was not before the court in *Roskilly*.

Second, the claimant also argues that the Court of Appeals panel inappropriately decided *sua sponte* to address aspects of interpretation of K.S.A. 44-510e(a) without allowing the parties an opportunity to brief or argue these points. Ordinarily an appellate court will not consider an issue on appeal if it was not raised below. *In re Tax Appeal of Alsop Sand Co., Inc.*, 265 Kan. 510, 521, 962 P.2d 435 (1998). Here, however, whether the Board's award was per-

missible under K.S.A. 44-510e(a) was squarely before the Court of Appeals. The fact that the Court of Appeals' interpretation of that statute led it to a conclusion claimant had not foreseen does not make the panel's action inappropriate.

Moving to the merits, it is evident that both the ALJ and the majority of the Board implicitly interpreted K.S.A. 44-510e(a) to require evidence of a physician's opinion only on task loss and not on wage loss. The Court of Appeals called this assumption into question and, "as a matter of apparent first impression," interpreted the statute to require a physician to testify concerning the effect of task loss on wage-earning capability. Because no physician had imposed restrictions on claimant's performance of tasks that would affect his ability to earn, the Court of Appeals reversed the disability award. 36 Kan. App. 2d at 542-26.

The statute sets out a formula for computing a permanent partial work disability award. Stated mathematically, the percentage of permanent partial work disability is equal to the percentage of task loss plus the percentage of wage loss divided by two. The task loss percentage is defined by the plain language of the statute as the "percentage to which the employee, in the opinion of the physician has lost the ability to perform [preinjury] work tasks." K.S.A. 44-510e(a). The wage loss percentage is defined by the plain language of the statute as "the difference between the [preinjury] average weekly wage . . . and the [postinjury] average weekly wage." K.S.A. 44-510e(a).

The plain language of the statute also tells us that the percentage of task loss is dependent in part on the opinion of a physician. The statute contains no similar evidentiary requirement for proof of the wage loss percentage; it is simply calculated by the factfinder based on the difference between the preinjury weekly wage and the post-injury weekly wage. K.S.A. 44-510e(a).

The Court of Appeals erred in overlooking the import of this plain language in the statute, instead attempting to divine legislative intent from a review of legislative history. See *Graham I*, 36 Kan. App. 2d at 525. In our view, that step is unnecessary. Statutory interpretation begins with the language selected by the legislature.

If that language is clear, if it is unambiguous, then statutory interpretation ends there as well. See *Perry*, 281 Kan. at 809.

We also note that earlier Court of Appeals cases recognized that the statute required a physician's opinion to support only task loss, not wage loss. See *Gadberry v. R.L. Polk & Co.*, 25 Kan. App. 2d 800, 803, 975 P.2d 807 (1998) (two-part test for finding and measuring work disability includes measurement of both ability to perform work tasks, actual loss of wages resulting from disability; statute requires claimant to provide physician's opinion on task loss); *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 318-19, 944 P.2d 179 (1997) (definition of permanent partial work disability expresses clear legislative intent to have physician render opinion on task loss, comparing tasks performed during previous 15 years of employment).

Here, the ALJ heard the opinions of two physicians and found Zimmerman's opinion that claimant sustained a 43 percent task loss more credible than Fevurly's opinion of zero task loss. The wage loss determination, as contemplated by K.S.A. 44-510e(a), was made by the ALJ based on "the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury." K.S.A. 44-510e(a).

The second substantive question we must address on this appeal is whether the record supports the Board's finding of wage loss.

Claimant's preinjury average weekly wage was $498.36. See K.S.A. 2006 Supp. 44-511(b)(5). On claimant's postinjury weekly wage, the ALJ specifically noted that the information provided by the parties was "contradictory in some points and duplicative in others" and that "claimant's wage fluctuated considerably since he returned to work on a semi-regular basis in June 2003." Notwithstanding these imperfections in the evidence, the ALJ found that, from June 12, 2003, through September 25, 2004, claimant earned an average weekly wage of $381.32.

The Board adopted the ALJ's finding that, although claimant was being paid at a rate 40 percent above his preinjury wage, his pain-limited ability to accumulate work hours in his accommodated position with FedEx resulted in a wage loss. The Board also spe-

cifically affirmed the finding that claimant was earning less than 90 percent of his preinjury wages.

We see several flaws in the Court of Appeals panel's treatment of this issue.

The panel began its discussion by equating the statute's use of the phrase "engaging in work" to "able to earn." K.S.A. 44-510e(a) prohibits permanent partial general disability compensation if an employee is "engaging in work" for wages equal to 90 percent or more of the average preinjury wage. The panel said the record was insufficient to support claimant's contention that he was "unable to earn" that amount. We see a distinction with impact between the actual "engaging in work" of the statute and the theoretical "able to earn" of the Court of Appeals. Claimant may be theoretically able to earn more, but substantial evidence supports the Board's determination that his actual pain prevents the theory from becoming a reality.

The Court of Appeals panel also reexamined claimant's postinjury records and found that, in certain weeks, he earned 90 percent or close to 90 percent of his preinjury wages. 36 Kan. App. 2d at 527. In doing so, the panel implicitly rejected the apples-to-apples approach of the Board and ALJ, *i.e.*, comparing preinjury and postinjury weekly *averages* rather than comparing a preinjury average to cherry-picked postinjury weeks. Again, the plain language of the statute did not support the panel's method; the statute repeatedly references gross weekly wage averages. The panel's reexamination also overstepped its standard of review on the Board's factual findings. It failed to review the evidence in the light most favorable to the prevailing party, instead reweighing it. See *Neal*, 277 Kan. at 16-17. The existence of evidence contrary to the Board's findings did not dictate its reversal. See *Sumner v. Meier's Ready Mix, Inc.*, 282 Kan. 283, 144 P.3d 668 (2006); *Webber*, 272 Kan. at 705.

The panel also advanced a policy rationale for its decision—its desire to avoid manipulation of a system that permitted a work disability award "based purely on reported pain." *Graham I*, 36 Kan. App. 2d at 527. It wanted to avoid a situation where a worker could control "his or her workweek to assure that, *on average*, the postinjury weekly wage will not exceed the 90 percent of preinjury

wage that would make the worker ineligible for the award, even through the worker demonstrates a clear ability to earn the 90 percent any time desired." 36 Kan. App. 2d at 527. There are at least three reasons why this rationale was inappropriate. First, public policy is usually the arena of the legislative branch. Second, even if the judiciary was charged with setting public policy, other mechanisms exist for detection of fraudulent workers compensation claims. See K.S.A. 2006 Supp. 44-501; K.S.A. 44-510e(a); K.S.A. 2006 Supp. 44-551; *Lowmaster v. Modine Mfg. Co.*, 25 Kan. App. 2d 215, 219, 962 P.2d 1100, *rev. denied* 265 Kan. 885 (1998). And, third, there is absolutely no evidence in the record that this particular claimant was "faking his pain or lack of ability to work full time."

We hold that the Board's findings were supported by substantial competent evidence in the record considered as a whole under the correct legal standards. Claimant's pain from his work injury limits his earnings by exerting downward pressure on the number of hours he can work. The ALJ and Board calculated claimant's resulting average postinjury wage, as was directed in K.S.A. 44-510e(a). When that average was compared to the preinjury average, claimant had a wage loss to be averaged with task loss. The resulting percentage justified the ultimate award.

The Court of Appeals is reversed. The Workers Compensation Board and administrative law judge are affirmed.

JOHNSON, J., not participating.
LARSON, S.J., assigned.