NOT DESIGNATED FOR PUBLICATION

No. 123,114

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PATRICK WILLIAMS,
*Appellant*,

v.

WELLCO TANK TRUCKS, INC., AND COMPSOURCE MUTUAL INS. CO.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed July 23, 2021. Affirmed.

*Jan L. Fisher*, of McCullough Wareheim & LaBunker, of Topeka, for appellant.

*Timothy A. Emerson*, of Wallace Saunders Chartered, of Wichita, for appellees.

Before ARNOLD-BURGER, C.J., GARDNER and ISHERWOOD, JJ.

PER CURIAM: Patrick Williams appeals from the Workers Compensation Board's (Board) decision affirming the administrative law judge's (ALJ) denial of work disability benefits for Williams. As part of an award for permanent partial general disability under the Kansas Workers Compensation Act (KWCA). Williams asserts the Board erred when finding that his wage loss percentage was below the threshold level required under K.S.A. 2020 Supp. 44-510e(a)(2)(ii). He also challenges the constitutionality of legislative amendments that adopted the Sixth Edition of the American Medical Association Guides (AMA Guides, Sixth Edition) for evaluating permanent partial impairment. On appeal he concedes that the later issue is now moot because of the Kansas Supreme Court's recent decision in *Johnson v. U.S. Food Service*, 312 Kan. 597,

1

478 P.3d 776 (2021), so we will not address it. Because we find that there was substantial competent evidence to support the Board's finding that Williams current average weekly wage constitutes the post-injury average weekly wage that Williams is capable of earning, we affirm.

FACTUAL AND PROCEDURAL HISTORY

In October 2014, Williams began working for Wellco Tank Trucks, Inc. (Wellco) as an over-the-road truck driver. His job duties entailed loading and unloading, taping and securing loads, and transporting the loads to multiple states. Williams' average weekly wages while working for Wellco were $745.45.

Four months into his employment, Williams injured himself while securing a locomotive engine onto the flatbed of his truck. Wellco sent him to receive medical treatment. Doctors diagnosed him with a biceps tendon tear, and he had surgery the next month. Williams' symptoms did not improve with surgery. He ultimately underwent a cervical fusion. The doctor released Williams from treatment with permanent restrictions that included a 45-pound floor-to-knuckle lifting restriction and a 25-pound above-the-waist restriction. Because Wellco could not accommodate any permanent restrictions, it terminated Williams' employment.

Doctors assigned Williams a 25% functional impairment of his body as a whole under the AMA Guides, Sixth Edition. Because his functional impairment was greater than 10%, Williams could qualify for ongoing disability payments if he suffered a post-injury wage loss of at least 10% because of the work injury. K.S.A. 2020 Supp. 44-510e(a)(2)(C). This case centers on whether his post-injury wage loss met the 10% floor to entitle him to ongoing disability payments from Wellco.

Following his termination and medical release, Williams secured employment with Long Trucking, LLC. Long agreed to hire him as a full-time truck driver for $16 per hour, but limited Williams' duties strictly to driving and told him violation of the medical restrictions would be cause for termination. The availability of hours for Williams varied according to the season and weather, so some weeks Williams did not work at all but others he worked at least the full 40 hours.

For 11 days in 2019, Williams and other Long Trucking employees went to Missouri to assist with cleanup for a natural disaster declaration because of flooding. According to Williams, this type of work was uncommon and was "the first time that [Long Trucking] has done that in 26 years." Long corrected this in his testimony by saying that it was not uncommon for his company to work on federal contracts with higher rates of pay, but this one was the only they had ever been called out on that dealt with a natural disaster. Because the work was under a federal contract, Long Trucking was required to pay Williams the "prevailing wage" of $30 per hour, $45 per hour of overtime, and $60 per hour on holidays. During that time, Williams worked long hours, including 93 hours of overtime and double time. Based on his pay records, Williams earned $53,232.51 over 74 weeks with Long Trucking. If the total pay Williams earned is used to determine whether his income loss was at least 10%, then his income loss is only 9% and he has no right to any disability pay. If the two weeks of uncommon federal contract pay is excluded, Williams would show up to a 14% wage loss and he would receive disability pay.

Williams retained Richard Thomas, a vocational consultant, to provide testimony and opinions on Williams' current earning capacity. Thomas reviewed Williams' medical records, educational and vocational background, and his current work restrictions. He believed Williams was working for Long Trucking in an accommodated capacity because of being unable to perform the full tasks of his prior employment. According to Thomas, the two paychecks Williams received—one for $2,297 and another for $4,050—as a

result of the federal prevailing wage job in May to June 2019 were "outliers," so Thomas excluded those amounts from the current earning capacity consideration because "they're not typical of what he would be able to earn" and were "because of a special situation." Thomas did not believe that these outliers reflected Williams' current earning capacity in the open labor market. Thomas concluded that a "true average weekly earnings ability would [be] best calculated by averaging the amounts excluding the earnings he had in May and June of 2019." Thomas also stated his vocational opinion was that Williams was "currently working at his full capacity when considering his age, education, experience and lack of other marketable transferable job skills."

The ALJ found that Williams' average weekly wage while working for Wellco was $745.45, based on a total of $7,454.48 over the 10 pay cycles between the start of his employment in November 2014 up until the date of his injury in February 2015. As for his current wages, the ALJ found that Williams had earned $53,232.51 over 74 weeks of employment for an average weekly wage of $719.36. The ALJ also noted that reviewing Williams' most recent 26 weeks of wages showed a total amount of $24,203 for an average weekly wage of $930.88, but that removing the "two outlier checks" resulted in a total of $17,856 and an average weekly wage of $744. As a result, the ALJ found Williams could not overcome the presumption that his actual earnings constituted his earning capacity. So he was not entitled to any disability payments.

Williams appealed the ALJ's decision to the Board, challenging the denial of his claim for work disability based on the determination of post-injury wage loss. Williams asserted the wage loss statute did not provide a specific calculation for post-injury wages and therefore the Board should consider all relevant factors to determine his post-injury earning capacity, urging the Board to base his average weekly wage on his capability "to earn in an open labor market." Williams also pointed out that the ALJ arbitrarily applied a 26-week period and failed to calculate the average weekly wage if he removed the

4

"outliers" from the 74-week period. Doing so would result in a total of $46,885.51 and a post-injury average weekly wage of $651.19 or a 12.6% wage loss.

The Board affirmed the ALJ's award. The Board found that Williams was not eligible to receive work disability benefits because he had not sustained at least 10% wage loss under K.S.A. 2020 Supp. 44-510e(a)(2)(C)(ii). The Board declined to exclude the earnings from the federal prevailing wage job because "doing so requires the Board to engage in 'cherry picking' disfavored by the Supreme Court in *Graham* [*v. Dokter Trucking Group*, 284 Kan. 547, 558, 161 P.3d 695 (2007)]." The Board explained that the plain language of K.S.A. 2020 Supp. 44-510e(a)(2)(E) required a presumption that average weekly wages actually earned constituted wage-earning capacity, and that Williams failed to overcome the presumption with competent evidence. The Board also noted that imputing Williams' "normal pay rate" to the hours worked at the federal job "would produce an average weekly wage of $678.13, which would result in a wage loss of 9.0%," thus still leaving him ineligible to receive work disability benefits.

Williams timely petitioned for judicial review.

ANALYSIS

Williams argues the Board erred in affirming the ALJ's denial of work disability benefits. He presents this challenge as two separate issues in his brief, but we will consider them together under the general question of whether the Board correctly concluded Williams had no right to work disability benefits because he suffered insufficient wage loss.

5

*We examine our standard of review.*

This court reviews decisions of the Board under the Kansas Judicial Review Act. K.S.A. 77-601 et seq.; K.S.A. 2020 Supp. 44-556(a). The primary issue Williams raises is whether the Board erroneously interpreted K.S.A. 2020 Supp. 44-510e(a)(2)(E). That question is reviewable under K.S.A. 77-621(c)(4), which states that the court shall grant relief if the Board "has erroneously interpreted or applied the law." When an issue turns on an issue of statutory interpretation, that presents a question of law over which this court exercises de novo review, owing no deference to the Board's interpretations of the KWCA. *Estate of Graber v. Dillon Companies*, 309 Kan. 509, Syl. ¶ 2, 439 P.3d 291 (2019).

But Williams also challenges whether the Board's decision denying work disability was supported by the record. That question is reviewable under K.S.A. 77-621(c)(7), which allows this court to grant relief if:

> "[T]he agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act."

Determining whether the Board's factual findings are supported by substantial competent evidence is also a question of law. *Atkins v. Webcon*, 308 Kan. 92, 95, 419 P.3d 1 (2018). "Substantial evidence" refers to "'evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis [of fact] from which the issue raised could be easily resolved.' [Citation omitted.]" *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

Reviewing the record as a whole requires this court to "(1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. The court does not reweigh the evidence or engage in de novo review. [Citations omitted.]" *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

*K.S.A. 2020 Supp. 44-510e(a)(2)(E) is unambiguous.*

Claimants in a workers compensation case have the burden of proof to establish their right to an award. K.S.A. 2020 Supp. 44-501b(c). Some general principles of statutory construction guide the analysis. The primary purpose of statutory interpretation is to give effect to the intent of the Legislature. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). The first step of statutory interpretation is to attempt to determine the legislative intent by looking to the words of the statute giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). In this regard, our Supreme Court has instructed:

> "When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009).

The controlling statute here is K.S.A. 2020 Supp. 44-510e(a)(2)(C), which provides:

> "An employee may be eligible to receive permanent partial general disability compensation in excess of the percentage of functional impairment ('work disability') if:

7

"(i)     The percentage of functional impairment determined to be caused solely by the injury exceeds 7 ½ % to the body as a whole or the overall functional impairment is equal to or exceeds 10% to the body as a whole in cases where there is preexisting functional impairment; and

"(ii)    the employee sustained a post-injury wage loss, as defined in subsection (a)(2)(E) of K.S.A. 44-510e, and amendments thereto, of at least 10% which is directly attributable to the work injury and not to other causes or factors.

"In such cases, the extent of work disability is determined by averaging together the percentage of post-injury task loss demonstrated by the employee to be caused by the injury and the percentage of post-injury wage loss demonstrated by the employee to be caused by the injury."

Here, the Board affirmed the ALJ's award establishing William's functional impairment as 25% to the body as a whole resulting from his work-related injuries. Neither party disputes that Williams meets the first criteria under subsection (i). Instead, the parties focus on the second criteria:  post-injury wage loss of at least 10%.

K.S.A. 2020 Supp. 44-510e(a)(2)(E) defines wage loss as "the difference between the average weekly wage the employee was earning at the time of the injury and the average weekly wage the employee is *capable of* earning after the injury." (Emphasis added.) The statute provides:

"The capability of a worker to earn post-injury wages shall be established based upon a consideration of all factors, including, but not limited to, the injured worker's age, physical capabilities, education and training, prior experience, and availability of jobs in the open labor market. The administrative law judge shall impute an appropriate post-injury average weekly wage based on such factors. Where the employee is engaged in post-injury employment for wages, there shall be a rebuttable presumption that the average weekly wage an injured worker is actually earning constitutes the post-injury

8

average weekly wage that the employee is capable of earning. The presumption may be overcome by competent evidence." K.S.A. 2020 Supp. 44-510e(a)(2)(E).

Before a legislative amendment in 2011, the work disability benefit statute only looked at an injured worker's actual pre- and post-injury wages when calculating wage loss. See L. 2011, ch. 55, § 9; *Graham*, 284 Kan. at 556 ("[Wage loss] is simply calculated by the factfinder based on the difference between the preinjury weekly wage and the postinjury weekly wage."). A review of caselaw reveals that the 2011 amendment sought to "remove financial incentives for injured workers to increase their benefits by deliberately seeking out low paying jobs or quitting altogether after suffering a compensable loss." *Locke v. Barnds Brothers, Inc.*, No. 112,029, 2015 WL 2137207, at *3 (Kan. App. 2015) (unpublished opinion); see also *Bergstrom*, 289 Kan. at 610 (plain language of pre-2011 statute did not require an injured worker to make a good-faith effort to seek post-injury employment).

The record establishes—and Williams does not dispute—that he was engaged in post-injury employment for wages when the ALJ issued its award in this case. Under the pre-2011 version of the statute, the ALJ and Board would simply calculate Williams' wage loss by looking at the difference between his actual pre- and post-injury wages. But wage loss under the current version depends on post-injury *earning capacity* and creates a rebuttable presumption that any actual post-injury earnings are equal to an injured worker's earning capacity. According to Williams, this rebuttable presumption applies to *any* variance between post-injury earning capacity and actual wages. Wellco does not dispute that point, and nothing about the plain language of the statute seems to prohibit a claimant from trying to show that their actual earnings exceeded the average weekly wage they would otherwise be capable of earning.

9

So we find no ambiguity in the statute, and Williams does not specifically point to any. The issue is just one of proof. What evidence must a party submit to overcome the presumption?

Kansas law defines a presumption as "an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." K.S.A. 60-413. Because the record established that Williams was engaged in post-injury employment for wages, the ALJ and Board had to presume that his actual earnings constituted his earning capacity. Thus, to rebut that presumption, it follows that Williams would need to show that his actual earnings were *different* than his earning capacity. A straightforward reading of the language in the statute dictates that the competent evidence that a party need to present to rebut the presumption would relate to the factors listed in the statute that allow the ALJ to establish an injured worker's earning capacity along with other evidence that shows a different earning capacity than the actual earnings. So the question becomes whether the Board erred in concluding Williams failed to rebut the presumption.

*The Board did not err in finding that Williams had failed to rebut the statutory presumption that his actual wages are indicative of what he is capable of earning.*

Williams made two arguments before the Board that his actual earnings did not constitute his earning capacity: (1) that the truck driving position with Long Trucking was an accommodated position that did not exist in the open market; and (2) that he received a higher than usual rate of pay and worked excessive overtime hours during the two-week period, making those wages unique and not reflective of his earning capacity.

As for the first argument, the Board found that Williams failed to overcome the presumption because Thomas' testimony depended on "faulty assumption[s]" that Williams could not compete in the open labor market and "was performing sheltered

10

employment in a made-up job created by a friend." This conclusion was found to be untruthful when comparing it to the testimony of Randall Long, who hired Williams, and denied knowing Williams at all before hiring him. Williams also denied knowing Long before being hired. There was no evidence to suggest that Williams' job with Long Trucking was an accommodated position that did not exist in the open market. Williams appears to concede that these findings are supported by the record because he chose not to appeal that issue. So Williams' case rests on his second argument:  that he has rebutted the presumption by showing that the two weeks of inflated pay does not reflect his earning capacity.

Williams first asserts that the Board only discussed whether to exclude the outlier paychecks in the context of declining to cherry-pick his actual earnings. The Board relied on *Graham* in its decision here, explaining that the Kansas Supreme Court approved an "apples-to-apples approach" of comparing pre-injury average weekly wages to post-injury wages without "cherry-pick[ing] postinjury weeks." 284 Kan. at 558. Williams suggests this court can ignore the *Graham* decision because our Supreme Court decided it before the 2011 amendment. But this court is duty bound to follow Kansas Supreme Court precedent absent some indication of a departure from a previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). While true that *Graham* was based on the pre-2011 version of K.S.A. 44-510e(a), the current wage loss calculation is not significantly different than before the 2011 amendment when actual wages are available. The statute still requires calculating the difference between pre-injury average weekly wage and post-injury average weekly wage. The Kansas Supreme Court's disapproval of cherry-picked weeks when comparing pre- and post-injury average weekly wage remains intact even with the 2011 amendments because the Board is still required to consider actual earnings when they are available. As a result, *Graham* is still binding precedent.

11

Next, Williams argues that the ALJ and the Board failed to consider the statutory factors in determining his post-accident wage earning capacity. The statute requires that earning capacity is determined by considering—at a minimum—"the injured worker's age, physical capabilities, education and training, prior experience, and availability of jobs in the open labor market." K.S.A. 2020 Supp. 44-510e(a)(2)(E). It is unclear how Williams believes that the Board did not consider these factors or how it was to consider these factors as they relate to his sole remaining claim of two inflated paychecks. There is no dispute that Williams is "currently working at his full capacity when considering his age, education, experience and lack of other marketable transferable job skills." And his current employer revealed he was a good employee. Instead, Williams asserts that he has overcome the presumption that paid wages equate to earning capacity solely by showing that his actual earnings exceeded his earning capacity based on two outlier paychecks that he cannot expect to duplicate in the future.

The Board understood Williams' position and addressed specifically why it did not believe he had overcome the statutory presumption. There is no dispute that Williams presented evidence through Thomas to support his claim. But the Board found that Thomas' conclusions were not supported by the record. That is a credibility determination. The Board concluded that the new work Williams completed over a two-week period may have been unusual, but it was work that all his coworkers also performed. So it was appropriate to impute those wages. There is evidence in the record to support the Board's conclusion.

Although the particular federal disaster assignment that Williams worked on for 11 days was unusual—because it involved a federal disaster—and was slightly longer than most, Long said his company had received similar assignments in the past where they had to pay the prevailing federal wage. In fact, Long stated that such situations are common, and others have lasted for longer than one week. He testified, and Williams agreed, that at least one other such assignment had come up while Williams was working

12

for him, but Williams was working on another assignment and was not available to go on the federal assignment. Williams would otherwise be eligible for these federal prevailing wage jobs when they arose. And Long expected that it could happen again, although he could not predict when. It was also undisputed that Williams base pay was $16 per hour, and he averaged 30 hours per week. Sometimes he had no work in a week and other times he would make significant time and a half, or $24 per hour. Williams' pay stubs reflected these fluctuations.

Thomas did state his opinion that the two weeks Williams worked during the Missouri federal disaster were outliers. When asked, "Did you believe that those were appropriate for to consider in his earnings?" He responded that the ALJ should impute them because

> "all he did was drive the dump truck to the quarry, they loaded the dump truck, he drove it back to where the water was flooding and dumped the load and then drove back and kept doing that, you know, all day long. He didn't do a regular job—he didn't do a regular job he would be doing normally for driving."

But those were the exact duties Williams performed for Long Trucking according to Randall Long. "Mr. Williams drives a truck. That's it. . . . He shows up, he crawls in his truck, he starts it, and he drives it." Later Thomas testified that those amounts were outliers because they were not typical of what Williams would be able "to earn this day forward." But Thomas later said that he did not know that Williams testified that these opportunities were available occasionally. So much like his discounting of whether his hiring was an above-board transaction, Thomas' statements that the ALJ should not consider the earnings because Williams did not do his regular job and this was a onetime unique situation, received no support in the record.

13

The ALJ averaged Williams post-injury earnings from the 24 most recent periods, which would remove the outliers, and found that his pre- and post-injury wages were virtually identical. He declared any further discussion regarding disability payments, moot. The Board found that it would use the entire 74 weeks of Williams' work for Long, thus diluting the impact of the outlier weeks, and found that Williams sustained a 3.3% wage loss, which was less than the 10% minimum for future disability payments. We find that there is substantial competent evidence in the record to support the Board's finding. The opportunity to make higher wages was an ongoing possibility and no evidence supported a finding that it would not happen again. Accordingly, the Board did not err in finding that Williams had failed to rebut the presumption that actual wages equate to wages a person is capable of making post-injury. As a result, we need not examine whether the Board's alternative finding was also supported by the record.

Affirmed.