33,948

Minnie B. Hudson, Widow of James Hudson, Deceased, *Appellee*, v. Salina Country Club, Respondent, and Phoenix Indemnity Company, Insurance Carrier, *Appellants*.

(84 P. 2d 854)

Opinion filed December 10, 1938.

*Allen B. Burch, Henry E. Martz* and *Allen A. Schaefer,* all of Wichita, for the appellants.

*Albert W. Poston, Jr.,* of Salina, for the appellee.

The opinion of the court was delivered by

Smith, J.: This was a claim for workmen's compensation by a widow for the death of her husband. The commissioner of workmen's compensation awarded compensation to the widow. This award was approved on appeal to the district court. Respondent appeals.

The deceased was porter at the Salina Country Club. One evening he drove to his home in his automobile to get some towels and some laundry his wife had been doing at their home for members of the club. Shortly after he drove into the yard his wife heard a shot; she heard him groaning. He had been shot by a pistol bullet, and died that night.

The respondent argues that the claimant did not produce anything more than surmise and conjecture that the death was the result of an accident arising out of and in the course of the employment of deceased. On account of this argument the evidence will be noted in some detail.

The doctor testified that he found deceased in the evening with a bullet wound in his abdomen ranging upward through the liver and lodging in the right chest. He did not see how deceased could possibly have shot himself at that angle. Deceased made no statement. The next witness was a member of the club, and testified that he

dealt with deceased as custodian of the grill room and locker room of the club; that the salary of deceased at the time of his death was $15 a month; that in addition to this deceased received the profits from the operation of the grill room, where he sold drinks and sandwiches, and he handled towels, from which he derived a profit; that it was his duty to have the towels cleaned and washed, and he would bring towels to the club any time they ran out; that it was his duty to take care of the grill room and locker room. This witness testified in part as follows:

"Q. Mr. McCullough, was it his duty to look after the property that was left out there in the locker rooms belonging to individuals, or personal property that was stationary? A. Not necessarily property belonging to the members, although he did, but there was nothing in our contract that he was to take care of that personal property, but he always did do that."

This witness also testified about deceased bringing his wallet home to him on one occasion when he had left it in his pants pocket; that deceased's work began at eight in the morning and he never knew when he was going to get home. This witness also testified as follows:

"A. We have about 360 lockers there that it was his duty to see they were kept clean; he kept the moths out of the carpets, looked after the toilets and baths, and the grill room, refrigerators, and that stuff connected with the grill room.

"Q. That is what you meant by part of his employment being to take care of the club's property. A. That's right."

He further testified as follows:

"Q. Did he have any duties to perform under his contract of employment which required him to carry a firearm that you knew of? A. No, I think that would have been up to him. He might have had a reason, but as far as we hiring him to, we didn't."

The sheriff was the next witness. He testified that deceased had been a deputy sheriff; that deceased had told him he wanted a permit to carry a gun because he was custodian at the country club; that on one occasion he picked up some fellows out there who had stolen some stuff and held them until some one from the sheriff's office came out after them; that he never heard deceased say he had permission from any members of the club to carry a gun.

The wife of deceased was the next witness. She testified on the night of the death of deceased he called up and told her to have things ready; that he was coming after her and that he was going back because there was a party on that night; that he came in and

honked and she was getting ready to go out and she heard the report of a gun; in a few minutes she heard him groaning; she went out and found him stretched on his back; that he said over the phone that he wanted some towels and laundry for the golfers and he wanted her to go back out with him to help get ready for the party; that after they took deceased to the hospital she found some bundles of dirty laundry in the back of the car; that in the year 1933 his profits were $1,200 and in 1934 were $1,500; that she had heard deceased say in the presence of Mr. Peck that the reason he wanted to carry a gun was that the club had been robbed and Mr. Peck told him to guard the place; that deceased had $150 on him when he was killed; that she could not tell when the conversation with Mr. Peck took place, but it took place at Mr. Peck's office and nobody but herself and deceased and Mr. Peck was there. The record does not show whether Mr. Peck had any official connection with the club.

The next witness was a member of the club. He testified that he knew deceased, and his duties were the doing of regular routine porter work.

A demurrer to the evidence was presented and overruled.

The same witness who testified for claimant about the work of deceased testified on behalf of respondent that he had charge of deceased and he did not know he carried a gun and did not give him permission to carry one.

The next witness for respondent was also a member of the club. He testified that he was vice-president of the club and had a general knowledge of what deceased did around the clubhouse; that he did not know whether or not deceased carried a gun; that he was hired as a porter, and in his opinion that would not require the carrying of a gun.

The next witness was a member of the club. He testified that the duties of deceased were to keep the place clean and to take care of the locker room; that is, in his opinion it was not necessary that deceased carry a gun in order to do what he was hired to do; that he was employed to protect the locker rooms, but not as a policeman; that he was not financially responsible if things were stolen.

One other member of the club testified to the same general effect.

The man who was sheriff in 1935 testified that deceased obtained from him the permit to carry a gun while he was sheriff; that deceased was working at the state house as a doorkeeper or sergeant at arms at the time; that he did not believe he had ever called de-

ceased to act as deputy sheriff. None of the witnesses who were members of the club could remember of any robbery out there.

After hearing the above testimony the commissioner found as a matter of fact that deceased met his death as the result of an accident arising out of and in the course of his employment. On appeal the district court approved this award. We are asked to reverse that judgment.

The only condition under which we can do that is that all of the evidence, taken in its most favorable light for claimant, and drawing the inferences therefrom favorable to the claimant, compel a finding that will not support the award, or that the evidence upon which the award is based must appear to be mere surmise or conjecture. (See *Whitaker v. Panhandle Eastern P. L. Co.*, 142 Kan. 314, 46 P. 2d 862.)

The question of fact at issue in this case is whether the accident by which deceased met his death arose out of and in the course of his employment. There seems to be no contention but what he met his death as the result of an accidental discharge of a revolver he had been carrying.

A definition of the term "arising out of and in the course of his employment" that has met with general approval appears in *McNicol's Case*, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916 A. 306. In that case the court said:

"1. The first question is whether the deceased received an 'injury arising out of and in the course of his employment,' within the meaning of those words in part II, §1 of the act. In order that compensation may be due, the injury must both arise out of and also be received in the course of the employment. Neither alone is enough.

"It is not easy nor necessary to the determination of the case at bar to give a comprehensive definition of these words which shall accurately include all cases embraced within the act and with precision exclude those outside its terms. It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It arises 'out of' the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart

from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." (p. 498.)

It will be noted that the above case holds that it may be said that an accident happens "in the course of the employment" when it comes while the workman is doing the duty which he was employed to perform. Applying that rule here, we have no difficulty in holding that there was substantial, competent evidence for the commissioner to find that one of the duties of the deceased was to keep the club supplied with clean towels and to take the laundry of the club members from the club to his home. There is no doubt that he had gone to his home for that purpose on the evening he was killed. It is also clear that he had gone there to get his wife and take her out to the club in order that she might help him get ready for the party.

It is with the term "arising out of" the employment that we have difficulty in this case. It will be noted that the above authority states that an injury arises out of the employment when there is apparent to the rational mind upon consideration of all the circumstances a causal connection between the conditions under which the work is required to be performed and the resulting injury. Narrowed down, our question is whether the carrying of a gun by deceased had anything to do with or was any part of his work. In answering such a question we must indulge all reasonable inferences in favor of claimant, and we must consider all the surrounding facts and circumstances.

Respondent points out that several members of the club testified that deceased was not hired as a policeman and that his duties did not require him to carry a gun. The only evidence to the contrary is that concerning a conversation had by deceased with a Mr. Peck. This record does not disclose that Mr. Peck had any official connection or was even a member of the club. The record is silent as to whether he had any authority to direct deceased to guard the property of the club. Even should we assume that Mr. Peck was a member, we cannot assume that he had authority to bind the club.

We have concluded that the evidence giving the claimant the benefit of all the presumptions, and drawing every reasonable inference in his favor, shows that the deceased in this case carried the gun in question for the protection of his own person and the money he ha-

bitually carried on his person for the benefit of respondent and that there was no substantial evidence that anyone with authority to speak for respondent gave him any permission to carry a gun while on duty at the country club or that the carrying of a gun was incidental to the work he was employed to perform for the club. We are unable to see any connection between the employment of deceased and the accidental discharge of the gun that caused his death. It follows that the judgment of the trial court in holding that the death of deceased arose out of and in the course of his employment was erroneous.

The judgment of the trial court is reversed, with directions to enter judgment for respondent.