No. 44,915

MARION A. SIEBERT, Widow and Guardian of David D. Siebert, Minor Dependent of Donald J. Siebert, Deceased, *Appellees,* v. ORVILLE J. HOCH and R. F. HOCH, d/b/a HOCH's DAIRY, ORVILLE J. HOCH, d/b/a VICTORY ALL STAR DAIRY, and ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Appellants.*

(428 P. 2d 825)

Opinion filed June 10, 1967.

*Raymond L. Spring* and *Jerry W. Hannah,* both of Topeka, argued the cause, and *Clayton M. Davis* and *Mark L. Bennett,* both of Topeka, were with them on the brief for the appellants.

*Charles L. Davis, Jr.,* of Topeka, argued the cause, and *Byron M. Gray, Robert D. Hecht,* and *David L. Ryan,* all of Topeka, were with him on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: This is a workmen's compensation proceeding brought by the widow and minor child of Donald J. Siebert to obtain compensation for his death. The workmen's compensation examiner and the director, upon review, denied such an award. Upon appeal by claimants the district court granted it.

The sole question presented in this appeal by respondents and their insurance carrier is whether the district court's conclusion that the death of the workman arose out of and in the course of his employment is supported by the evidence.

The evidentiary facts and circumstances surrounding the death, to the extent they were developed at the hearing before the examiner, are not in dispute. There is dispute as to the interpretation and conclusion to be drawn from those facts—in view of their paucity—and as to that which actually occurred, as shown by the evidence.

The story is perhaps best told initially by stating the comprehensive findings of fact made by the district court as follows:

"1. Claimants, Marion A. Siebert, age 23 years, and David D. Siebert, age 2 years on April 23, 1964, are respectively the widow, and minor child of Donald J. Siebert, deceased, and were wholly dependent upon his earnings.

"2. On June 14, 1963, Donald J. Siebert met his death, at which time he was employed as a workman by Orville J. Hoch. The parties are governed by the Kansas Workmen's Act. The employer had actual knowledge of the accident and written claim for compensation was served within the prescribed time. The average annual earnings were sufficient for the maximum payable. Funeral and burial expenses were $1,134.32.

"3. The workman, Donald J. Siebert, was employed as manager of a distribution dairy at Topeka, Kansas. His employer lived and spent most of his time operating another business in Emporia, Kansas. The employer made weekly visits to the Topeka dairy and telephoned Siebert nearly every day.

The dairy business consisted of the house to house delivery of milk to consumers or customers and the operation of a retail store for the sale of dairy products. The persons who were employed in the retail store worked regular hours. The employer established the hours of public business for the retail store and the pay scale. Siebert was required to report changes in employees. Except as to these matters, Siebert was in control of his own hours and schedule as long as he got the job done, and it was left up to him to execute the work as he desired without direction or control of the employer, except as to the result of the operation. The employment included authority to be in the business location at any time. The employer had no knowledge of the full time required to perform the various duties or the hours when performed but all of the duties carried out were within the employer's authorization.

"Siebert was a good worker, worked long hours and it would have been an exception if he were off and away from work as long as eight hours at a time. In general, he performed the following duties. He operated the delivery route. As deliveryman, he had the responsibility of loading the delivery truck and delivering the milk to consumers. The time of loading was left to his determination: On occasions after he had closed for the night at 10:30 p. m., he would, after going home, return to the premises and load the delivery truck. Delivery would require all morning and would be finished about 1:30 p. m. The starting time varied, depending on demand volume of that day. In the afternoon, he would solicit new accounts. He supervised the other employees. He was responsible for the opening and closing of the business place. The retail store closed at 10:30 p. m. His wife was employed as a bookkeeper. After closing, she would assist him. He counted the money from the sources of income, appropriate book entries were made to the customers, retail store, or other source accounts and for the employer. On Saturday, he regularly made the bank deposit for the week which usually was in excess of a thousand dollars. Normally, on Thursday nights, the cash book work and cleaning up required them to remain at the dairy until about midnight or 12:30 a. m.

"4. With the knowledge and consent of the employer, Siebert had a couch placed in the manager's office to be used for his rest and comfort. The office was small and the couch was located near the safe. In order to reach the safe, it was necessary to travel a narrow passageway between the couch and the manager's desk.

"5. At least an hour and fifteen minutes was required for one man to load the refrigerated truck used for the house to house deliveries. Two days a week, including Friday, when the consumer demand was heavy, Siebert would normally start his route earlier than other days. Friday was the heaviest day of the week, and he would start his route about 3:00 a. m.

"6. On Wednesday preceding Siebert's death, his wife separated from him and did not thereafter perform her usual duties at the dairy.

"7. On the occasion in question Siebert closed the store at 10:30 p. m. and stated he was unusually tired. He went to his home which required at least twenty minutes travel time by automobile. At some time thereafter, he returned to the dairy. The following morning, when an employee came to work, Siebert was found dead lying on the couch in the office. Cause of death was a .22 caliber slug entering the deceased at the left temple area at a time when

he was asleep. Death had occurred some time between midnight and 2:00 a. m. on June 14, 1963. The truck was loaded and parked in the building ready to make a delivery and was hooked up to refrigeration unit to keep contents cool and was normally not hooked up if it wasn't loaded. The cash receipts for two days had not been counted and they were in a bag in the safe. Cash receipts for the rest of the week were also in the safe.

"8. When the body was discovered, the only clothing thereon was a pair of jockey shorts. The deceased's clothes were hanging on the clothes tree. There were three pairs of women's pants and a nightgown on the floor directly at the foot of the couch. These pants contained male sperm. They appeared to have been worn by the deceased and taken off all at one time, rolled together as if they had been pulled down.

"9. There was no evidence of any forcible entry into the building. The safe and its contents were not disturbed. A wallet, in the trousers of the deceased hanging on a clothes rack near the couch, which contained approximately $100 was not taken. There was no disarray or disturbance of the furniture or any other items in the building. It was possible to enter the building without the breaking of doors or locks by pushing aside the garage door sufficient to pass through even though it was fastened from the inside with a wooden bar across the same. Entrance could then be gained to the office from portholes from a cooler walk-in, and entrance could also be had through a roller where cans are rolled through. This was known to employees and others.

"10. Sometime during the night of January 15, 1964, the building which had previously been locked was entered by an unknown person. The safe, whose combination was known by only one employee and which was locked, had been opened and the money in it removed. There was no forcible entry to the building and except for the condition of the safe, there was no disarrangement or disorder of the furniture or other items in the building except the removal of some gallon milk containers from the counter to the floor of the cooler. Although the circumstances were investigated by the police, the person committing the offense has not been ascertained or apprehended.

"11. Don Siebert owned a .22 caliber pistol received as a Christmas gift in 1962. He had inquired of a uniformed patrolman if he could keep his gun at work to protect the place. The last knowledge of it was that it was placed in the glove compartment of Donald Siebert's car about a month or two before his death, when it was put there on an occasion when he and his wife were at target practice by the river. Jim Siebert knew that the gun was normally kept in the glove compartment. The gun was not located after the death.

"12. The separation of decedent's wife on the Wednesday preceding his death resulted from an argument with her husband and of his beating her which was brought on as she was trying to awaken him at an early hour to go to work. This was seen by his brother, Jim Siebert, age 19 years, who had visited and spent the preceding night at their home. She left intending to go to Wisconsin. While driving to the dairy with the intention of getting her wages, she was flagged down and stopped by Jim Siebert on the road. He told her he had witnessed the beating Don had given her and was mad enough

to kill him. At his suggestion, it was agreed that she would go to Emporia (at which place he was working) and remain there for the rest of the week, and that he would take her to Wisconsin on Saturday. Marion Siebert occupied a room with her small child at the Broadview Hotel at Emporia, Kansas. On Thursday night, he visited with her at the hotel room, watched television and left about midnight to go to his car for a blanket because the room was cold. He returned about two hours later, stated that he went down and got some gasoline and rode around. He delivered the blanket and left.

"From what people had told her, Jim Siebert was supposed to have made it very plain that he was in love with her, but she was not in love with him and had no plans to marry him. She had no personal knowledge about who actually committed the crime. The circumstances of his death were investigated by the Topeka police department. No arrests have been made and no one has been charged with the murder of the decedent.

"13. The workman was killed by some unknown person intent on burglary and larceny while the workman was on duty and in his employer's service."

From the foregoing the district court concluded the workman's death was by accident arising out of and in the course of his employment and awarded compensation accordingly. The respondents and their insurance carrier, appellants herein, assert the record contains neither direct evidence nor logical inference to support the court's finding as a fact and conclusion as a matter of law that the workman's death arose (1) out of and (2) in the course of his employment.

Our workmen's compensation act (K. S. A. 44-501) provides that in order to be compensable an accidental injury must arise "out of" and "in the course of" the employment. The two phrases have separate and distinct meanings (*Floro v. Ticehurst,* 147 Kan. 426, 76 P. 2d 773, *Bailey v. Mosby Hotel Co.,* 160 Kan. 258, 160 P. 2d 701); they are conjunctive and each condition must exist before compensation is allowable (*Pinkston v. Rice Motor Co.,* 180 Kan. 295, 303 P. 2d 197, *Tompkins v. Rinner Construction Co.,* 194 Kan. 278, 398 P. 2d 578); and as to them every case must be determined upon its own facts.

The phrase "in the course of" employment relates to the time, place and circumstances under which the accident occurred, and means the injury happened while the workman was at work in his employer's service (*Pinkston v. Rice Motor Co.,* supra).

This court has had occasion many times to consider the phrase "out of" the employment, and has stated that it points to the cause or origin of the accident and requires some causal connection between the accidental injury and the employment. Some of our decisions to this effect are: *Carney v. Hellar,* 155 Kan. 674, 127 P. 2d

496; *Jones v. Lozier-Broderick & Gordon,* 160 Kan. 191, 160 P. 2d 932; *Neal v. Boeing Airplane Co.,* 161 Kan. 322, 167 P. 2d 643; *Hilyard v. Lohmann-Johnson Drilling Co.,* 168 Kan. 177, 211 P. 2d 89; *Pinkston v. Rice Motor Co.,* supra; and *Bohanan v. Schlozman Ford, Inc.,* 188 Kan. 795, 366 P. 2d 28.

This general rule has been elaborated to the effect that an injury arises "out of" employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury (see *Hudson v. Salina Country Club,* 148 Kan. 697, 84 P. 2d 854; *Wilson v. Santa Fe Trail Transportation Co.,* 185 Kan. 725, 347 P. 2d 235; *Rorabaugh v. General Mills,* 187 Kan. 363, 356 P. 2d 796).

An injury arises "out of" employment if it arises out of the nature, conditions, obligations and incidents of the employment (*Bohanan v. Schlozman Ford, Inc.,* supra; *Geurian v. Kansas City Power & Light Co.,* 192 Kan. 589, 389 P. 2d 782). In *Taber v. Tole Landscape Co.,* 181 Kan. 616, 313 P. 2d 290, this court stated the foregoing tests exclude an injury not fairly traceable to the employment and not coming from a hazard to which the workman would have been equally exposed apart from the employment.

Passing the problem of whether the death was shown to have occurred "in the course of" employment, we examine the record in the light most favorable to claimants, appellees herein, to ascertain if there was sufficient competent evidence to support the trial court's conclusion that the death arose "out of" the employment. The crucial finding, of course, is No. 13 wherein the court concluded the workman was killed by some unknown person intent on burglary and larceny. From this it is asserted by appellees, and the trial court so reasoned, that the workman was exposed to the hazard of attempted burglary and consequent assault while on and in charge of the premises where the employer's money was kept, thereby rendering the assault causally connected and incident to the employment.

Appellants contend there is no evidence to suport finding No. 13. This finding is merely a conclusion of fact and appellees must stand, if at all, on the evidentiary matters stated in the preceding twelve findings. The record does contain other items of evidence which are not in dispute but, from appellees' standpoint, nothing additional

in support of the burglar theory beyond that contained in the first twelve findings. Some of those other items will be mentioned later.

Appellees contend that finding No. 10—that seven months later the building was burglarized and the safe in the room in which Siebert was killed was opened—is evidence of burglarious entry on June 14, 1963. This is the only evidence advanced in support of the June burglary. We must determine, first, whether this, with the other circumstances, is sufficient evidence in support of finding No. 13.

Appellees rely primarily on *Phillips v. Kansas City, L. & W. Rly. Co.*, 126 Kan. 133, 267 Pac. 4, for their position the evidence sufficiently supports finding No. 13. *Phillips* was a proceeding to obtain compensation for the death of appellee's husband who, while employed as a ticket agent at appellant's station in Kansas City, was fatally injured by blows on the head inflicted by someone whose identity was not ascertained. Decedent Phillips had been given the privilege of operating a lunch counter in the waiting room of the station where candy and sundries were sold. He was required to keep the ticket office, waiting room and stand open daily until 10:15 p. m. About 9:00 p. m. he was found unconscious inside the gate by the candy counter. The door of one showcase was open. He had earlier deposited money from sales of tickets in the safe of the freight room, but smaller amounts of money were found in the ticket drawer, in a cigar box, in a cigar can under the counter and in his pockets. His damaged spectacles were found under the icebox. During the two years Phillips had acted as agent the ticket office had been robbed four or five times and the freight office once. There was hearsay testimony indicating the station was robbed at the time decedent was injured but this testimony was not considered. This court stated:

"The employment was such that it invited assault with intent to rob (*Stark v. Wilson, Receiver*, 114 Kan. 459, 219 Pac. 507). The waiting room was a place where robbers did ply their trade, and it was doubtless because of this fact that Phillips kept his money scattered here and there about the place in small sums. The inclosed space in which Phillips' duties required him to be was invaded. The time chosen by the intruder for his appearance in the waiting room was the nighttime, and was a time when the waiting room was not occupied by anyone who gave an alarm. The open door of the candy case suggests that Phillips was lured to the place of assault near the gate by a pretended patron. Those who inspected the place do not refer to any implement of attack or defense which Phillips possessed. He was mortally wounded by repeated blows on the head with some deadly weapon which was not found on the premises.

The departing person left the gate open. These circumstances fairly indicate assault with criminal intent, and not merely lawful resistance to an act of aggression by Phillips. What was the nature of that intent—gratification of private grudge by a personal enemy, or the gaining of access to money known to be kept somewhere behind those show cases? While the basis for inference is not entirely satisfactory, the court is unable to say there was no substantial evidence to support the district court's finding that Phillips 'was slugged by a bandit while on duty as ticket agent and station keeper for the defendant railway company.' The finding being valid, the injury arose out of the employment." (p. 138.)

Here the workman was shot in the head while asleep in the locked and darkened office. Appellees contend he was shot by a burglar intent on larceny, asserting whoever entered the building the night Siebert was murdered is the same unknown person who returned seven months later and completed the burglary.

Appellees are entitled to all reasonable inferences and deductions to be drawn from the evidence, circumstantial as well as direct. But we are unable to infer that a burglary occurred on the night Siebert was killed simply from the fact a burglary under mysterious circumstances occurred at the same place seven months later. We regard this as sheer speculation and conjecture.

There was no direct evidence introduced to indicate an attempted burglary. The affair was investigated by Topeka police. The investigating detective found no evidence indicating a burglary and attempted larceny and was of opinion there was no such attempt. A uniformed patrolman who had provided night protection to the buildings in the area knew of no incidents at the dairy in the two years of his employment preceding the homicide, although it was shown there had been burglaries in the neighborhood at some undisclosed time prior to Siebert's death. There was not the slightest indication in the evidence a would-be burglar was frightened away, or that the same person returned, as hypothecated by appellees.

The examiner who initially heard the case found the evidence was lacking to show Siebert was shot as a result of an attempted burglary but that to the contrary the circumstantial evidence pointed to his death as a result of being shot over personal matters. The director found similarly, stating he could not find in the record sufficient evidence to show a causal connection between the accident and the employment.

We believe the *Phillips* case must be distinguished from the case at bar. There the premises had been robbed at least five or six times

before, with the result money was kept in various places in small sums. The small working space was invaded. The door to the candy case was opened, indicating the deceased had been lured to the place of assault. This court, aside from the hearsay testimony, believed the rational inferences to be drawn supported the theory of banditry.

Appellants argue that, as the examiner found, the only rational inference to be drawn here from the evidence is that Siebert met his death because of personal reasons not associated with the employment.

It is not necessary for us to decide whether this proposition is established. The burden of proof is not upon appellants to make out a defense. The burden remains on appellees to establish by evidence the connection of the death with the employment. Such connection may not rest on mere surmise or conjecture (*Jones v. Lozier-Broderick & Gordon,* 160 Kan. 191, 160 P. 2d 932). The record does contain other evidence, beyond that in the trial court's finding, tending to support the examiner's conclusion. Siebert's brother Jim, who was not called as a witness and who also worked for respondents evidently at Emporia, knew about Siebert's pistol being in Siebert's automobile; the automobile was parked outside the dairy the night of the murder; the pistol, conceivably the murder weapon, was never found. Siebert's widow, one of the appellees, told an agent of the Kansas Bureau of Investigation she thought her brother-in-law, Jim, had shot her husband; however, the agent, as a result of his examination, concluded she really had no firsthand knowledge of how the crime was committed.

We conclude finding No. 13 is not supported by the evidence.

The general rule has been stated that assaults for private reasons do not arise out of the employment unless, by facilitating an assault which would not otherwise be made, the employment becomes a contributing factor (1 Larson's Workmen's Compensation Law, § 11.00). Viewed as a totally unexplained assault appellees still may not prevail in the light of the rules already stated. Once the burglary theory is eliminated, the record contains no showing the employment brought the workman in contact with the risk that in fact caused his death or that it increased that risk—as was the situation in *Stark v. Wilson, Receiver,* 114 Kan. 459, 219 Pac. 507, and in *Phillips*—or of any connection at all between the employment and the death.

Proof of the shooting of Siebert by an unknown assailant, for no known reason or motive, without more, fails to meet the statutory requisite that the death arose "out of" the employment. It becomes unnecessary to consider whether it arose "in the course of" the employment.

The judgment is reversed

APPROVED BY THE COURT.