(200 P.3d 479)
No. 100,191

SHARON MCCREADY, *Appellee,* v. PAYLESS SHOESOURCE and
FIDELITY & GUARANTY INS., *Appellants.*

Opinion filed January 30, 2009.

*James C. Wright,* of Topeka, for appellants.

*Jan L. Fisher,* of McCullough, Wareheim & LaBunker, of Topeka, for appellee.

Before GREENE, P.J., HILL, J., and BRAZIL, S.J.

HILL, J.: This is a workers compensation appeal arising from Sharon McCready's work at Payless Shoesource, Inc. McCready made a claim for benefits after she hurt her right ankle when she stepped on a roll of tape that was left on the floor at her workplace. Then, several months later, as she was returning to work after visiting a company doctor, McCready fell, with no explanation why, on the sidewalk going to her employer's warehouse and hurt her right knee, right wrist, and her back. McCready made a claim for those injuries as well. An administrative law judge and then the Workers Compensation Board awarded McCready workers compensation benefits for both claims. Here, Payless Shoesource, Inc., appeals the awards made by the Board.

In this appeal, Payless raises allegations about both of McCready's injuries. Payless contends her ankle impairment is a result of McCready's preexisting diabetic condition. The employer argues its expert's testimony about this is more persuasive than the other two doctors who testified. Because the law directs us not to weigh the evidence at this point and we review the appellate record in a light favorable to the prevailing party, we hold the Board's findings

about this ankle injury are supported by substantial evidence and affirm.

Turning then to the second injury (caused by the unexplained fall), Payless argues McCready simply fell while walking to her job site, a normal day-to-day activity and her injury is therefore not compensable. We do not think the resolution of this issue is so simple. Workers compensation is our method of providing cash-wage benefits and medical care to the victims of work injuries in Kansas. In such cases, either the employers or the employees bear the risks of injury, depending on the nature of the risk. These risks are grouped into three general categories by our Supreme Court: those risks particular to the job; those personally associated with the worker; and neutral risks, not associated with either employer or employee. The employer bears the costs of neutral risks. Unexplained falls at work are neutral risks. In the light of Supreme Court precedent, we must agree with the Board's risk analysis. Because McCready's fall was unexplained and substantial competent evidence supports the Board's impairment findings, we affirm.

*The case history reveals three injuries received at different times with one claim now undisputed.*

Sharon McCready's work history reveals challenges because over the years she suffered three injuries at work. She worked as a general warehouse employee for Payless from February 1998 to October 2006. She packed shoes into individual boxes at a rate of 600 boxes per hour. This job required her to lift up to 45 pounds and often to be on her feet for 10 hours a day, except for during her lunch and two other breaks. Her last actual working day at Payless was September 30, 2005.

McCready's first two accidents at work came about 3 years apart. Her first work injury came on February 2, 2002. She injured her right knee and right wrist when she fell down some stairs. McCready reported the accident to Payless and received medical treatment for her injuries from Dr. Donald T. Mead. After looking at her X-rays, Dr. Mead assessed McCready's injuries as sprains and treated her with support bandages. Then, on March 17, 2005, while at work, McCready injured her right ankle when she stepped

on a roll of tape. She reported the accident to her supervisor but did not seek medical treatment until July 2005. In July, Payless sent McCready again to Dr. Mead who made an X-ray examination and then referred her to Dr. Peter Lepse. After a magnetic resonance image study was made of her right ankle, McCready was placed on work restrictions and put on light duty at work.

Then, McCready received her third injury on September 9, 2005. McCready left work to visit Dr. Mead so she could receive an impairment rating for her right knee and right wrist injured in her fall in 2002. When she left for her doctor's visit, she clocked out of work. After Dr. Mead finished his evaluation of McCready's wrist, a friend picked her up and drove her back to the warehouse. He dropped McCready off at the handicapped walkway leading up to the front door of the warehouse. When McCready got out of the car, she was wearing a brace on her right ankle. She turned to her right to step toward the warehouse door and fell forward, landing on her right knee. McCready could not explain why she had fallen but stated that "[she] saw the door and then [she] saw the cement."

*McCready's injuries lead to claims for workers compensation benefits.*

McCready claimed workers compensation benefits for her various injuries. An administrative law judge heard her initial claims. The judge found McCready suffered a 2% impairment to her right wrist from the February 2, 2002, fall; that she suffered a 10% right ankle impairment from the March 17, 2005, accident of stepping on the roll of tape, and that she suffered a 5% right knee impairment as a result of her fall on September 9, 2005. While the parties did not dispute the judge's ruling about McCready's right wrist, both McCready and Payless appealed the other awards to the Workers Compensation Board.

Both parties made contentions of error to the Board. Payless contended McCready's September 2005 fall did not arise out of and in the course of her employment. But, if the fall is compensable, Payless stresses McCready only sustained a knee impairment. The employer also argued to the Board that McCready's

10% right ankle impairment rating (a rating stipulated to by both sides) is not attributable to the accident on March 17, 2005, but it is related to her diabetic condition. On the other side, in her appeal to the Board, McCready argued contrary to the administrative law judge's conclusion, that she did suffer permanent impairment in her low back and right hip from the September 2005 fall.

*We summarize the doctors' evidence found in the record.*

Dr. Sankoorikal assigned McCready a permanent partial impairment of 5% for the whole body. But he based this rating on the premise that McCready lacked a history of back pain. McCready had never mentioned to Dr. Sankoorikal that she had seen Dr. Tennant (a chiropractor) prior to the fall. Had he known that information, Dr. Sankoorikal stated he might have apportioned some of that rating to her preexisting back condition: "If—if I had known that it was the same—same treatment as given her for probably the same complaints, probably I would have apportioned that. . . . I would say maybe 60/40, 60 percent for aggravation of her existing problem maybe."

Dr. Mead assigned permanent impairment ratings of 2% for McCready's upper extremity (right wrist) and 0% for her right knee. Although Dr. Mead was not hired to assign McCready a rating for the injuries she sustained in the September 2005 fall, he provided such an opinion in his deposition. Because McCready had never informed him of her previous back complaints and treatments with Drs. Tague (weight loss) and Tennant (chiropractic), Dr. Mead stated that with this information, he would have changed his original diagnosis to chronic preexisting back pain and would have ordered her to follow up with her personal doctor. Also, in reviewing Dr. Tennant's records, Dr. Mead opined he would have assigned her a 5% impairment rating for her low back preceding the September 2005 fall because the fall did not cause any change to her back impairment.

McCready hired Dr. Koprivica, who established impairment ratings for all of her injuries. Although Dr. Koprivica did not personally evaluate McCready, he based his assessment on her subjective

complaints and her medical records. In his reports, Dr. Koprivica provided the following ratings:

a. For the injuries she alleged to have occurred on February 2, 2002, Dr. Koprivica assigned a 0% impairment rating to her right knee and a 10% mild impairment rating to her right wrist.

b. For the injuries she alleged to have occurred on December 17, 2003, Dr. Koprivica assigned a 0% impairment rating to her left knee.

c. For the injuries she alleged to have occurred on March 17, 2005, Dr. Koprivica assigned a 10% mild impairment rating to her right ankle. Dr. Koprivica believed that McCready had sustained a right ankle sprain and, currently, was at maximal medical improvement.

d. For the injuries she alleged to have occurred on September 9, 2005, Dr. Koprivica assigned a 35% impairment rating to her right knee and a 5% impairment rating to her low back that included the right hip. We note that McCready did not mention her treatments with Dr. Tennant to Dr. Koprivica. However, even after considering Dr. Tennant's treatment, Dr. Koprivica stated he would not apportion any of the 5% to preexisting problems because a change in his assessment would have to be based on whether she was symptomatic on an ongoing basis during that time frame.

*The Board affirms but changes one part of the award.*

The Board unanimously affirmed part of McCready's initial award of benefits, and a majority modified her award to include a permanent partial impairment to the body as a whole. Based on the evidence, the Board affirmed the administrative law judge's findings on McCready's right ankle injuries. Going on then to her back injury, a majority of the Board affirmed the administrative law judge's ruling of granting benefits for this injury but disagreed with his rationale. The majority determined that McCready's injuries from the September 2005 fall constituted an unexplained fall, which it found compensable. Because the majority found that the September 2005 fall arose out of and in the course of employ-

ment, the majority then examined whether that fall caused Mc-Cready's low back and right hip injuries. Relying upon the experts' general agreement that McCready sustained a 5% permanent impairment to her back, the majority found that the September 2005 fall was the attributable factor. Therefore, the majority revised the judge's decision and awarded McCready compensation benefits for a 5% permanent partial impairment to the body as a whole for McCready's back complaints.

*We review first McCready's right ankle impairment claim and affirm the Board's decision.*

The Workers Compensation Board affirmed the administrative law judge's findings on this issue based on the evidence. The Board weighed the testimony of the doctors and were not persuaded by Dr. Baker:

"There is no dispute that claimant suffered an accident on March 17, 2005 when she turned her ankle. The dispute stems from the fact that claimant also suffers from diabetes and according to Dr. Baker, the physician who respondent retained to provide a rating examination, claimant's ankle injury was caused by the diabetic condition rather than the accident claimant describes. No other physician came to this conclusion and like the ALJ, the Board is not persuaded by this testimony."

The employer challenges the Board's decision. Payless argues that the permanency of McCready's right ankle impairment was caused by her preexisting condition of diabetes and not the incident that took place on March 17, 2005. Payless cites Dr. Baker's testimony to us for support.

Our standard of review on this issue is simple. As an appellate court, we limit our review of questions of fact in a workers compensation case to whether the Board's findings of fact are supported by substantial evidence. Actually, this is a question of law. See *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514, 154 P.3d 494 (2007).

The record shows the experts agreed on some points and disagreed about others. Dr. Koprivica and Dr. Baker gave 10% impairment ratings for McCready's right ankle. Also, both doctors agreed that on March 17, 2005, McCready sprained her right ankle

after stepping on a roll of tape. Dr. Baker, however, further concluded that McCready's sprain in her right ankle should have resolved itself and any "pathology that remains in this ankle is related to her diabetic arthropathy and neuropathy." It is on this distinction that Payless requests this court to reverse.

But we do not weigh evidence, especially when both diagnoses are supported by the record:

"Substantial evidence in the workers compensation context is evidence possessing something of substance and relevant consequence to induce conviction that an award is proper; it furnishes a basis of fact from which an issue can be resolved reasonably. *We review the evidence in the light most favorable to the prevailing party and do not reweigh competing evidence or assess credibility of witnesses.* [Citations omitted.] *The Board's findings will be upheld if supported by substantial evidence even though other evidence in the record would have supported contrary findings.* [Citation omitted.]" (Emphasis added.) *Graham v. Dokter Trucking Group,* 284 Kan. 547, 553-54, 161 P.3d 695 (2007).

We must defer to the expertise of the Workers Compensation Board on this point and not substitute our judgment for the Board's. The Board's findings on this issue are supported by substantial evidence from Dr. Koprivica. We affirm the Board's award for the right ankle impairment.

*When reviewing the Board's findings arising from the unexplained fall, we look at the statutes, a recognized authority, some prior cases, and the record on appeal.*

Fundamentally, our Workers Compensation Act (K.S.A. 44-501[a]) requires an employer to compensate its employee for personal injuries if they arise "out of" and "in the course of" employment. Those two terms, "out of" and "in the course of," have acquired specific meanings from the many cases that have construed them. Their significance arises from being conjoined:

" 'The two phrases arising "out of" and "in the course of" employment, as used in our Workers Compensation Act, K.S.A. 44-501 *et seq.*, have separate and distinct meanings; they are conjunctive, and each condition must exist before compensation is allowable. The phrase *"out of"* employment points to the cause or origin of the worker's accident and requires some causal connection between the accidental injury and the employment. An injury arises "out of" employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to

be performed and the resulting injury. Thus, an injury arises "out of" employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase *"in the course of"* employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service. [Citations omitted.]' (Emphasis added.) [Citation omitted.]" *Rinke v. Bank of America*, 282 Kan. 746, 752, 148 P.3d 553 (2006).

Therefore, in order to receive workers compensation benefits, McCready must show this back impairment arose out of and in the course of her employment.

We look first at the time, place, and circumstances of the accident, or the "in the course of" component of the equation. Coming back to work, McCready fell on the sidewalk going into the warehouse. Ordinarily, the "going and coming rule" would exclude such an injury from falling within the scope of "out of and in the course of employment." See *Sumner v. Meier's Ready Mix, Inc.*, 282 Kan. 283, 288-89, 144 P.3d 668 (2006). This rule is found in K.S.A. 2007 Supp. 44-508(f):

"The words 'arising out of and in the course of employment' as used in the workers compensation act shall not be construed to include injuries to the employee occurring while the employee is on the way to assume the duties of employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence."

The "going and coming rule" is based upon the belief that, while on the way to or from work, the employee is exposed only to the same risks or hazards as the general public encounters, so that such risks are not causally related to the employment. Thus, if an injury falls within the "going and coming" rule, the employee will be denied compensation under the Act. *Sumner*, 282 Kan. at 289.

Despite this exclusionary rule, Kansas recognizes several exceptions to the "going and coming rule." See 282 Kan. at 289. The premises exception applies here. *Rinke*, 282 Kan. at 753; K.S.A. 2007 Supp. 44-508(f). The premises exception comes from the language in K.S.A. 2007 Supp. 44-508(f), which reads:

"*An employee shall not be construed as being on the way to assume the duties of employment or having left such duties at a time when the worker is on the premises of the employer* or on the only available route to or from work which is

a route involving a special risk or hazard and which is a route not used by the public except in dealings with the employer." (Emphasis added.)

The evidence supports the application of the premises exception here. The evidence shows that McCready fell on the handicapped walkway leading up to the front door of Payless. Payless does not dispute that this walkway is part of its premises: "Claimant exited a friend's car on *Respondent's* premises." (Emphasis added.) Significantly, the administrative law judge found that McCready's September 2005 fall was employment related and compensable. This finding was not disturbed by the Board. Seeing no evidence to the contrary in the record, we also conclude that McCready's injuries from the September 2005 fall arose in the course of her employment with Payless.

Next, we examine the arising "out of" requirement. Apparently, Payless disputes only the first question, whether McCready's injuries from the September 2005 fall arose *out of* her employment with Payless. This was also the sole focus of the Board on the point. Our court reviews this question under a substantial competent evidence standard. *Anderson v. Scarlett Auto Interiors*, 31 Kan. App. 2d 5, 9, 61 P.3d 81 (2002).

One of the purposes of civil law is to allocate risk. Someone bears the risks of personal injury. In the law of workers compensation, the responsible party who bears the risk can be either the employer or the employee. Our Kansas Supreme Court recognizes three categories of risks in which injuries may occur. The subsequent care for those injuries and impairment may or may not be compensable by workers compensation law. See *Hensley v. Carl Graham Glass*, 226 Kan. 256, 258, 597 P.2d 641 (1979). *Hensley* establishes three general categories of workplace risks: (1) risks distinctly associated with the job; (2) risks which are personal to the worker; and (3) neutral risks which have no particular employment or personal character. 226 Kan. at 258.

The risks falling in the first category are universally compensable. The risks falling in the second category do not arise out of employment and are not compensable. See *Martin v. U.S.D. No. 233*, 5 Kan. App. 2d 298, 299, 615 P.2d 168 (1980). And the risks

of the third or neutral category are compensable. Larson's Workers' Compensation Law explains the precept as a positional risk or but-for logic:

"[T]he nature of the cause of harm may be simply unknown. The commonest example of [this] is the unexplained fall in the course of employment. If an employee falls while walking down the sidewalk or across a level factory floor for no discoverable reason, the injury resembles that from stray bullets and other positional risks in this respect: The particular injury would not have happened if the employee had not been engaged upon an employment errand at the time. In a pure unexplained fall case, there is no way in which an award can be justified as a matter of causation theory except by a recognition that this but-for reasoning satisfies the 'arising' requirement." 1 Larson's Workers' Compensation Law §7.04[1][a], pp. 7-28 to 7-29.

In *Hensley*, the Supreme Court found that sniper fire was a compensable neutral risk. Hensley was installing glass around air conditioners on the roof of a parking garage when a sniper began firing shots. Ten individuals, including Hensley, were struck and either killed or injured by the sniper fire. The claimant, Hensley's wife, was awarded workers compensation benefits. The issue on appeal was whether the injury to the decedent arose out of his employment. In deciding that issue, the court in *Hensley* classified the sniper's assault on Hensley as a neutral risk because "[t]he chance of being struck by sniper fire is not an ordinary risk associated with glass installers nor was the shooting of Hensley motivated by any personal connection with the sniper." 226 Kan. at 258. Finally, the position Hensley's employment placed him in was telling for the court:

" 'The fact that at least three of the first six shots were fired at decedent and his co-worker clearly shows that they were prime targets, because of their physical location. Had they been on the street level, walking or driving, as was the general public they might not have been targets. In that situation they might have been on equal footing with the general public, however, *since they were in an elevated position making them closer to the sniper, their risk of being shot was substantially increased.*' " (Emphasis added.) 226 Kan. at 262.

These three categories of risk provide context and meaning for other statutes and cases, such as those that deal with day-to-day activities and personal conditions.

*We review our statute and cases dealing with day-to-day living and personal conditions.*

Preexisting disabilities, as a rule, receive no workers compensation benefits. K.S.A. 2007 Supp. 44-508(e) defines "personal injury" and "injury" as:

" 'Personal injury' and 'injury' mean any lesion or change in the physical structure of the body, causing damage or harm thereto, so that it gives way under the stress of the worker's usual labor. It is not essential that such lesion or change be of such character as to present external or visible signs of its existence. An injury shall not be deemed to have been directly caused by the employment where it is shown that the employee *suffers disability* as a result of the natural aging process or by the normal activities of day-to-day living." (Emphasis added.)

It is important to point out that the statute refers to a disability (not the injury) which is a result of the natural aging process or normal activities. A review of some contrasting rulings will clarify this rule.

In *Martin v. U.S.D. No. 233*, 5 Kan. App. 2d 298, 299-300, 615 P.2d 168 (1980), a panel of the Kansas Court of Appeals declined to construe the employee's back injury from exiting his truck in the employer's parking lot as a compensable neutral risk and likened it more to a noncompensable personal risk. In *Martin*, the claimant-employee worked as a custodian. After the claimant pulled into the employer's parking lot and parked his truck, he hurt his back while getting out of his truck. Prior to this incident, it was undisputed that the claimant had experienced problems with his lower back. The personal risk of injury was particular to the claimant because of his condition and not because of his employment.

In contrast to *Martin*, in *Anderson v. Scarlett Auto Interiors*, 31 Kan. App. 2d 5, 61 P.3d 81 (2002), the Kansas Court of Appeals did not believe that the employee's back injury from frequently entering and exiting vehicles was a noncompensable personal risk. In *Anderson*, the claimant got in and out of cars 20 to 30 times a day in the course of installing convertible tops, headliners, and carpets. The claimant was injured while entering a vehicle when he heard a pop in his lower back. The claimant testified that incident intensified his existing back problems and caused him to suffer new pain in his right leg. Prior to this injury, the claimant had

received treatment for his low back pain. His back condition was aggravated by any activity that required him to bend over, stoop, or lift heavy items.

The court in *Anderson* determined that "[a]lthough Anderson's back problems could be aggravated by everyday activities, that fact alone is not controlling" because the claimant's injury stemmed not only from his personal degenerative conditions but also from a hazard of his employment, *i.e.*, the requirement that he constantly enter and exit vehicles. 31 Kan. App. 2d at 11. Here, the risk of injury was associated with the job. Entering and leaving cars 20-30 times per day was peculiar to the work and not to the claimant; therefore, the injury and disability was compensable.

Exposure to the risk from the nature of the employment is important. The court in *Anderson* relied upon *Siebert v. Hoch*, 199 Kan. 299, 304, 428 P.2d 825 (1967), which indicated that an injury arises out of employment if the injury is fairly traceable to the employment and comes from a hazard the worker would not have been equally exposed to apart from the employment. In applying that rule, the court in *Anderson* determined that "[i]f Anderson had not been employed as he was, he would not have been equally exposed to the risk that ultimately caused his injury." 31 Kan. App. 2d at 11. Therefore, the court in *Anderson* upheld the Board's decision that the claimant's condition arose out of his employment. 31 Kan. App. 2d at 12.

In another personal condition case, similar to *Martin*, *Johnson v. Johnson County*, 36 Kan. App. 2d 786, 147 P.3d 1091, *rev. denied* 281 Kan. 1378 (2006), a panel of this court determined that an injury resulting from getting up out of a chair at work was a normal activity of day-to-day living, and thus not compensable. Both the administrative law judge in the case and the Board found that the claimant's injury arose out of her employment. The panel in *Johnson* reversed, citing facts from the record reflecting that Johnson had a history of three or four incidents of left knee pain. Also her treating physician had testified that she had years of knee degeneration and had some prior problems with the knee and "it was just a matter of time." 36 Kan. App. 2d at 788. Again, in this case the personal risk of injury was particular with the claimant

because of her knee condition. The disability was a result of a disease or aging process peculiar to the claimant, not her work.

In this case, the dissenter on the Board cited *Johnson* as support for denying McCready's claim. But in *Johnson*, the mechanism of injury and risk are clearly identifiable, rising from a chair, turning, and reaching for something. Further, the preexisting degenerated condition of the claimant's knee illustrated the personal nature of the risk. The statute and cases outlined above focus on personal risks, unique to the employees. These cases do not control here because this case involves an unexplained fall—a neutral risk.

This was truly a neutral risk. Neither party could explain the reason for McCready's fall. Getting out of the car did not cause her injury such as in *Martin* and *Anderson*. Standing up from a chair did not cause her disability as in *Johnson*. McCready was on the premises coming back to work and, giving deference to the Board's view of the facts, her disability does not arise from some personal condition. The risk should therefore be borne by Payless as the Board concluded.

We think the Board has read *Hensley* correctly. The record discloses, in the administrative law judge's findings, references to several other claims where the Board has held that neutral risks or unexplained falls are compensable. Those rulings appear to be consistent with our Supreme Court's risk analysis in *Hensley*. We must give deference to the Board on this point because it is required by law to help administer our Kansas workers compensation benefits. McCready's unexplained fall was a neutral risk. We hold McCready's injury arose out of her employment.

Our colleague in dissent notes that Kansas courts need not struggle with the relative risks of unexplained falls. This statement is true because our Supreme Court in *Hensley* ruled neutral risks are compensable. Ignoring this ruling, the dissent tries to stretch our statute that bars compensation from instances where a worker's disability is a result of the natural aging process or by the normal activities of day-to-day living to shield Payless in this case. McCready had no diseased knee that gave way as in *Johnson*, nor did McCready have chronic back degeneration as in *Martin*. McCready

fell in the course of her employment with no explanation. As the Board has ruled, this is a neutral risk that is compensable.

*We are not convinced that McCready's back condition was caused from a preexisting condition.*

Since we have found McCready's back injury arose out of her employment, we must examine Payless' remaining contentions. Payless argues that there is not enough evidence to find that McCready injured her back as a result of the fall because of her preexisting condition. Essentially, Payless asks this court to weigh evidence and assess the credibility of witnesses. As we have previously noted, this court is precluded from doing so. See *Graham v. Dokter Trucking Group*, 284 Kan. 547, 553-54, 161 P.3d 695 (2007). Instead, this court is confined to reviewing this issue using the substantial competent evidence standard. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514, 154 P.3d 494 (2007).

The record reveals substantial support for the Board's findings. Dr. Koprivica believed that the September 2005 fall caused McCready's impairment to her back. In addition, after considering the information that McCready had previous back treatments with Dr. Tennant, Dr. Koprivica testified that he would not apportion any of the 5% to preexisting problems because "[t]he critical information factually for me would be whether or not [McCready] continued to be symptomatic on an ongoing basis." Therefore, we conclude substantial competent evidence exists to support the Board's findings that the September 2005 fall was the cause for McCready's 5% permanent impairment to her back.

*We decline to affirm only the scheduled injuries.*

Payless asks us not to consider McCready's back injury in deciding whether McCready is permanently and totally disabled. Payless argues that only the scheduled injuries found in K.S.A. 44-510d should apply here. The employer wants us to view only McCready's right ankle injury of March 17, 2005, and any aggravation of her preexisting right knee injury of September 9, 2005, in the compensation calculation. If we did that, McCready would receive no benefits for permanent partial general disability.

We decline this invitation. The Board awarded McCready 5 percent permanent partial impairment to the body as a whole for her back complaints and permanent total disability benefits as of September 9, 2005. In addition, the Board held that the September 2005 fall caused her back injury. As we previously stated, these findings are supported by substantial competent evidence, and contrary to Payless arguments, this court will not reweigh such evidence to find otherwise.

K.S.A. 44-510e covers compensation for permanent partial general disabilities and thus covers those not included in the 44-510d schedule. K.S.A. 44-510e(a) reads:

"Permanent partial general disability exists when the employee is disabled in a manner which is partial in character and permanent in quality and which is not covered by the schedule in K.S.A. 44-510d and amendments thereto. The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury."

In this instance, K.S.A. 44-510d only covers McCready's right wrist, right ankle, and right knee. See K.S.A. 44-510d(a)(12), (a)(15), and (a)(16). McCready's low back injury would qualify under K.S.A. 44-510e. Our courts have held that if the injury is both to a scheduled member and to a nonscheduled portion of the body, compensation should be awarded under K.S.A. 44-510e. *Bryant v. Excel Corp.*, 239 Kan. 688, 689, 722 P.2d 579 (1986). Therefore, the Board did not err in considering McCready permanently and totally disabled.

Affirmed.

GREENE, J., dissenting: I respectfully dissent from my colleagues' conclusion that McCready's injuries of September 9, 2005, arose "out of" her employment. In summary, I would conclude the fall was the result of normal activities of day-to-day living and therefore not compensable under K.S.A. 44-508(e).

The facts appear to be undisputed and are stated in appellants' brief: "claimant exited a friend's car on respondent's premises, turned to walk down the sidewalk to the door and fell. She does not say she slipped, tripped or that the sidewalk had anything to do with causing her fall." According to claimant, she "[t]urned to the right to take a step up to the door" and "saw the door and then I saw the cement. . . . I don't know what happened." Moreover, it is undisputed that claimant was morbidly obese, weighing approximately 475 pounds, but the record is apparently silent on any relationship between this preexisting condition and the precipitation of the fall.

K.S.A. 44-508(e) provides in material part that "[a]n injury shall not be deemed to have been directly caused by the employment where it is shown that the employee suffers disability as a result of the natural aging process *or by the normal activities of day-to-day living.*" (Emphasis added.) As noted by the majority, a panel of our court has recently revisited this exception in *Johnson v. Johnson County*, 36 Kan. App. 2d 786, 147 P.3d 1091, *rev. denied* 281 Kan. 1378 (2006). In concluding that an injury resulting from getting up out of a chair at work was not compensable, the panel reasoned:

"The language of K.S.A. 44-501(a) and K.S.A. 2002 Supp. 44-508(e) shows that injuries caused by or aggravated by the strain or physical exertion of work do not arise out of employment if the strain or physical exertion in question is a normal activity of day-to-day living. Substantial evidence did not support the Board's finding that Johnson's act of standing up from a chair to reach for something was not a normal activity of day-to-day living. See *Poff v. IBP, Inc.*, 33 Kan. App. 2d 700, 710, 106 P.3d 1152 (2005) ('Standing and sitting are normal everyday activities.').

"Other jurisdictions which have considered similar factual scenarios have reached the similar conclusion that ordinary activities of daily living which result in on-the-job injuries are not compensable under workers compensation laws. [Citations omitted.]" 36 Kan. App. 2d at 790.

Just as standing, sitting, and getting up out of a chair are normal activities of day-to-day living, I would hold that stepping from a car and turning to walk down a sidewalk are also normal activities of day-to-day living. In fact, our court has previously held that a back injury suffered when a claimant exited his vehicle upon arrival at work was not compensable where neither the claimant's vehicle nor the condition of the premises had anything to do with the

injury. *Martin v. U.S.D. No. 233*, 5 Kan. App. 2d 298, 615 P.2d 168 (1980). The court noted that "almost any everyday activity would have a tendency to aggravate his condition [with a history of back problems], *i.e.*, bending over to tie his shoes, getting up to adjust the television, or exiting from his own truck while on a vacation trip." 5 Kan. App. 2d at 300.

A fair reading of our caselaw reveals that the test is to determine whether the injury was "fairly traceable to the employment and not coming from a hazard to which the workman would have been equally exposed apart from the employment." See, *e.g.*, *Angleton v. Starkan, Inc.*, 250 Kan. 711, 718, 828 P.2d 933 (1992); *Boeckmann v. Goodyear Tire & Rubber Co.*, 210 Kan. 733, 734, 739, 504 P.2d 625 (1972) (compensation denied when injury occurred when worker stooped down to pick up a tire because there was no difference between stoops and bends on the job or off); *Siebert v. Hoch*, 199 Kan. 299, 303-04, 428 P.2d 825 (1967); *Taber v. Tole Landscape Co.*, 181 Kan. 616, 313 P.2d 290 (1957). Here, an unexplained fall during an exit and turn from a vehicle is not fairly traceable to the employment but rather a hazard to which the worker would have been equally exposed apart from the employment.

In concluding that McCready's injury was compensable, the Board cited an authoritative treatise for the proposition that "[t]he majority of jurisdictions compensate workers who are injured in unexplained falls upon the basis that an unexplained fall is a neutral risk and would not have otherwise occurred at work if claimant had not been working," citing 1 Larson's Workers' Compensation Law §7.04[1]. Scrutiny of the treatise's "Digest" of recent cases, however, shows that jurisdictions are nearly evenly split on this question, with a bare majority of jurisdictions willing to compensate for "unexplained falls." Moreover, any such majority may result merely because many jurisdictions have statutory presumption of coverage. See 1 Larson's Workers' Compensation Law §7.04[3].

Notably, there is a lack of any treatise citations to Kansas cases. I respectfully believe this is because Kansas courts generally need not struggle with the relative risks of unexplained falls due to the statutory exclusion of coverage for injuries arising from normal ac-

tivities of day-to-day living. When properly analyzed, the central reason that many falls are "unexplainable" is that they have occurred in circumstances with no remarkable explanation or as a part of normal day-to-day activity common to any venue. Whether such falls occur while standing, sitting, stooping, walking, running, or otherwise, and in the absence of an explanation tracing the fall to the particular circumstances of the employment, our statutory scheme simply does not permit compensability.

For these reasons, I believe McCready's injuries from the September 9, 2005, incident are not compensable because they did not arise out of her employment, and I would reverse this aspect of the Board's award.