(204 P.3d 1177)
No. 99,909

EDWARD HAROLD ROBERTS, *Appellant*, v. MIDWEST MINERAL, INC., and BUILDERS' ASSOCIATION SELF-INSURERS' FUND OF KANSAS, *Appellees*.

Opinion filed April 3, 2009.

*Richard D. Loffswold, Jr.*, of Girard, for appellant.

*Wade A. Dorothy*, of The Dorothy Law Firm LLC, of Overland Park, for appellees.

Before MCANANY, P.J., BUSER and STANDRIDGE, JJ.

MCANANY, J.: Edward Harold Roberts was the plant superintendent for Midwest Mineral, Inc. He was responsible for supervision of Midwest's various quarry operations. His average weekly wage was $930. While making adjustments on a belt conveyor at the Coffeyville quarry, his right arm was caught in the machinery, resulting in the amputation of his arm 3 inches below the shoulder. Roberts was taken to the Coffeyville Regional Hospital where he was stabilized and then sent to St. John's Hospital in Tulsa, Oklahoma, for treatment. He was hospitalized for about 5 days. He was then fitted with a prosthesis and returned to work about 3 weeks after the accident.

The administrative law judge (ALJ) who considered Roberts' workers compensation claim found that his injury was compensable as a scheduled injury under K.S.A. 44-510d(a)(13). Midwest paid

Roberts 3.29 weeks of temporary total disability (TTD) for his actual healing period and $72,378.35 in medical expenses. The parties stipulated that Roberts was entitled to compensation for traumatic amputation of his right arm (including shoulder musculature) for 225 weeks. The ALJ awarded Roberts TTD benefits for 3.29 weeks followed by 225 weeks of permanent partial disability (PPD) compensation for his scheduled injury. However, the ALJ limited the PPD award to $50,000 based on the monetary cap in K.S.A. 44-510f(a)(4) which, the ALJ found, applied to all scheduled injuries.

Roberts appealed to the Workers Compensation Board (Board). The Board, by a ⅗ majority, affirmed the ALJ's order limiting Roberts' award to $50,000 pursuant to K.S.A. 44-510f(a)(4). The dissent noted, among other things, that the $50,000 cap in K.S.A. 44-510f(a)(4) applies only "for permanent partial disability *where function impairment only is awarded.*"

Roberts now appeals to us, arguing that the $50,000 compensation cap in K.S.A. 44-510f(a)(4) does not apply. This involves a matter of statutory interpretation, which is a question of law. Under the doctrine of operative construction, the Board's interpretation of the law is entitled to judicial deference. If there is a rational basis for the Board's interpretation, it should be upheld upon judicial review. However, the Board's determination on questions of law is not conclusive and, though persuasive, is not binding on the court. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 521, 154 P.3d 494 (2007); see *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007).

*The Statutes*

Our review of the relevant statutory scheme discloses that scheduled injury statutes exist in nearly every state's workers compensation system. 4 Larson's Workers' Compensation Law § 86.01, p. 86-2. Unlike the benefits for other injury claims, the benefits for scheduled injuries are not dependent upon actual wage loss. Rather, the schedule sets a statutory irrebuttable presumption of the worker's loss of earning capacity, regardless of how much or

how little time was lost from work on account of the injury. 4 Larson's Workers' Compensation Law § 86.02, p. 86-5.

### — K.S.A. 44-510d

In Kansas, scheduled injuries are characterized in K.S.A. 44-510d as "permanent partial disabilities." If an employee's work-related injury is a scheduled injury, the employee is not entitled to compensation beyond K.S.A. 44-510d "except that the director, in proper cases, may allow additional compensation during the actual healing period following amputation." K.S.A. 44-510d(b).

Under K.S.A. 44-510d, compensation for a scheduled injury is paid for a specified number of weeks depending upon the body part for which the claimant has experienced (1) a total loss (amputation) or (2) a permanent and total loss of its use (no amputation).

K.S.A. 44-510d(a)(23) provides that the "[l]oss of a scheduled member shall be based upon permanent impairment of function *to the scheduled member*" as determined using the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guidelines) (4th ed. 1993). This reference to the AMA Guidelines is the only reference to a functional impairment standard mentioned in K.S.A. 44-510d. This reference to functional impairment was added in conference committee in enacting legislative changes in 1993.

The maximum number of weeks of impairment for a nonscheduled functional impairment is 415 weeks pursuant to K.S.A. 44-510e(a). However, when a claimant suffers an amputation that includes the shoulder, K.S.A. 44-510d(a)(13) provides for an award of benefits which is limited to 225 weeks.

### — K.S.A. 44-510e

If the worker's PPD does not arise from a scheduled injury, K.S.A. 44-510e, which relates to permanent partial *general* disabilities, applies. *Casco v. Armour Swift-Eckrich*, 283 Kan. at 528.

The definition of functional impairment is found in K.S.A. 44-510e. "Functional impairment" is defined as "the extent, expressed

as a percentage, of the loss of a portion of the total physiological capabilities of the human body" under the AMA Guidelines.

As noted earlier, K.S.A. 44-510e(a)(1)-(3) provides that a claimant suffering a permanent partial general disability is entitled to receive at least 415 weeks of compensation at 66⅔% of the claimant's weekly wage, less TTD paid, multiplied by the percentage of functional impairment.

*— K.S.A. 44-510f*

K.S.A. 44-510f establishes the employer's maximum liability for disability compensation. Before 1993, K.S.A. 44-510f(a) limited the maximum workers compensation award to either $100,000 or $125,000. In 1993, subsection (a)(4) was added to K.S.A. 44-510f to limit awards to $50,000 for "permanent partial disability, where functional impairment only is awarded." L. 1993, ch. 286, sec. 35. The statute now provides:

"(a) Notwithstanding any provision of the workers compensation act to the contrary, the maximum compensation benefits payable by an employer shall not exceed the following:

. . . .

"(3) Subject to the provisions of subsection (a)(4), for permanent or temporary partial disability including any prior temporary total, permanent total, temporary partial, or permanent partial disability payments paid or due, $100,000 for an injury or any aggravation thereof; and

"(4) for permanent partial disability, where functional impairment only is awarded, $50,000 for an injury or aggravation thereof." K.S.A. 44-510f(a).

Our statutory scheme for scheduled injuries automatically reduced the number of weeks of compensation for Roberts' injury from the 415 weeks which would be allowed for a nonscheduled injury to 225 weeks for the loss of his arm and shoulder, a scheduled injury. Functional impairment is considered only in instances where the claimant suffers from a partial loss of use of a member, in which case there must be a determination of the percentage of loss of use of the scheduled member.

*Legislative History*

There is no meaningful legislative history regarding K.S.A. 44-510f(a)(4) or K.S.A. 44-510d(a)(23). It appears the legislature be-

gan struggling with workers compensation reform in 1991 because of accelerating costs to employers and their insurers. Also on the minds of legislators and the public was the ongoing notoriety of a workers compensation claim asserted by the Kansas Insurance Commissioner Fletcher Bell for a back injury sustained when he lifted a heavy briefcase from the trunk of his car while attending a meeting of insurance commissioners.

The first attempt at legislative reform was House Bill 2207, introduced in February 1991. House J. 1991, p. 149. After H.B. 2207 was passed and sent to the Senate, it languished there until April 1992 when the Senate Labor, Industry, and Small Business Committee recommended its passage. House J. 1991, p. 323; Sen. J. 1991, p. 261; Sen. J. 1992, p. 2008. While in the Senate Committee as a Whole, the language similar to what is now K.S.A. 44-510d(a)(23) (referring to the AMA Guidelines in the scheduled injury statute) and K.S.A. 44-510f(a)(4) (adding the $50,000 cap) was added, and the bill passed. Sen. J. 1992, pp. 2093, 2131. However, the bill was sent back to the House, where it never came out of committee. House J. 1992, p. 2527.

While H.B. 2207 was languishing in the Senate, the House Labor and Industry Committee introduced H.B. 3039 in the House on February 13, 1992. House J. 1992, p. 1349. During the meeting of the House Committee as a Whole, various members attempted to add amendments including language similar to what is now K.S.A. 44-510d(a)(23) (referring to the AMA Guidelines in the scheduled injury statute) and K.S.A. 44-510f(a)(4) (adding the $50,000 cap). Those amendments were rejected, and the bill was passed without them. House J. 1992, pp. 2310-11. When H.B. 3039 was sent to the Senate on April 11, 1992, the bill was referred to the Committee as a Whole but stricken from the calendar in May 1992. Sen. J. 1992, pp. 1999, 2566.

Following the 1992 legislative session, a legislative interim committee, which was comparing H.B. 2207 to H.B. 3039, noted that there were task forces also working on workers compensation issues for the Governor and the Insurance Commissioner. 1993 Kansas Report on Legislative Interim Studies, p. 188. While the committee noted that both H.B. 2207 and H.B. 3039 had different caps for

"functional impairment only," it made no recommendation regarding the caps. 1993 Kansas Report on Legislative Interim Studies, pp. 185, 191. The committee recommended the legislature deal with a variety of issues, including the problem of defining "work disability" under the permanent partial disability statutes, but made no mention of capping benefits. 1993 Kansas Report on Legislative Interim Studies, p. 191.

In 1993, workers compensation reform started with Senate Bill 307, which was introduced in February 1993. Sen. J. 1993, p. 152. S.B. 307, as originally drafted, was passed unanimously by the Senate on March 30, 1993, and sent to the House the same day. Sen. J. 1993, p. 668; House J. 1993, p. 706. The House passed the bill with only minor amendments in April 1993. House J. 1993, p. 987. After returning to the Senate, the bill was sent to a six-member conference committee. Sen. J. 1993, p. 952. During the conference committee's deliberations, the committee added language similar to what is now K.S.A. 44-510d(a)(23) (referring to the AMA Guidelines in the scheduled injury statute), and K.S.A. 44-510f(a)(4) (adding the $50,000 cap). Sen. J. 1993, p. 1116. The bill, as amended by the conference committee, was approved by both the House and the Senate and signed by the Governor. Sen. J. 1993, pp. 952, 1223; House J. 1993, pp. 1154, 1224.

There were no minutes preserved from these legislative conference committees. However, in the 1993 Kansas Legislature Summary of Legislation, published by the Legislative Coordinating Council and the Legislative Research Department, S.B. 307 was discussed, noting that the bill permitted benefits during a healing period only in cases involving amputation and that the bill required the use of the AMA Guidelines to determine impairment "for all scheduled injuries." 1993 Kansas Legislature Summary of Legislation, p. 160. In a separate paragraph entitled "Permanent Partial General Disabilities-Maximum Benefits-Work Disability," S.B. 307 was described as establishing the work disability standard (unable to engage in work at 90% of prior wage rate). The $50,000 cap for functional impairment awards was discussed only in this subsection of the legislative summary. 1993 Kansas Legislature Summary of Legislation, p. 160.

*Functional Impairment*

Next, we consider whether functional impairment benefits were awarded for Roberts' amputation, making the $50,000 limitation in K.S.A. 44-510f(a)(4) applicable. If functional impairment benefits were not awarded, then Roberts' award is limited to $100,000 under K.S.A. 44-510f(a)(3).

A majority of the Board held that the $50,000 limitation provision applied. The Board offered two reasons for its decision. First, it held that its previous decision in *Biggs v. Davis, Unrein, Hummer, McCallister, Biggs & Head L.L.P.*, Docket No. 241,091 (February 13, 2002), controlled. In *Biggs,* the Board held that there is nothing in K.S.A. 44-510f(a)(4) that excludes scheduled injuries or limits it to general body injuries. Biggs, an attorney, was involved in an automobile accident in which he suffered a 78% permanent partial disability to his upper arm at the shoulder. He received 5.14 weeks of TTD. The Board rejected his argument that K.S.A. 44-510f(a)(4) only applied to nonscheduled general body disabilities, noting that the language of K.S.A. 44-510f(a)(4) did not specifically limit its application to nonscheduled injuries. Moreover, the Board cited to the Kansas Workers Compensation Handbook, which indicated the provision was intended to "prevent large recoveries on functional ratings by highly paid white collar workers who sustain injuries, but miss no work," without noting the handbook's caveat that if TTD was awarded as well, the "functional impairment only" provision might well not apply. Worker's Compensation Handbook § 9.04, p. 9-9.

Second, the Board held that Roberts' argument that an amputation should be treated differently because an amputation was a *loss of a scheduled member*, as opposed to its *loss of use*, fails because both loss of and loss of use injuries are treated the same under K.S.A. 44-510d.

As in the case now before us, two members of the Board in *Biggs* dissented, noting that PPD benefits payable for scheduled injuries were already limited by statute and that the reference to "functional impairment only" could only refer to nonscheduled, general body disabilities. The *Biggs* dissenters also argued that even if

K.S.A. 44-510f(a)(4) applies to some scheduled injuries, it does not apply to amputations because there is no functional impairment for an amputation and "loss of a scheduled member by amputation is not compensated based upon a percentage of functional impairment."

*Biggs* does not control. In *Biggs,* the claimant did not suffer an amputation but rather an injury to his upper arm and shoulder for which he was awarded compensation based on a permanent partial general disability. The parties stipulated that Biggs suffered "a 78 percent permanent partial disability to the left upper extremity at the shoulder based upon the 80 percent functional impairment opinion of Philip E. Higgs, M.D., and the 76 percent functional impairment opinion of Joseph G. Sankoorikia, M.D." *Biggs,* Board slip op. at 2.

Compensation for Biggs' injury was controlled by K.S.A. 44-510d(a)(21), which governs the permanent *partial* loss of the use of a shoulder. This section of K.S.A. 44-510d(a)(21) differs from the sections governing an amputation because it provides for a different manner of calculating an award if the injury involves a permanent partial loss, as opposed to a *total* loss of or *total* loss of use. Unlike in Roberts' case, Biggs had to provide expert testimony concerning the functional impairment of his shoulder, and the functional impairment was considered in calculating his award. To the contrary, Roberts provided no such medical testimony. This is because in the case of an amputation, the award is not based upon a percentage of functional impairment. The award for an amputation is computed by multiplying the worker's weekly TTD compensation rate by the number of weeks of compensation allotted for the scheduled member. K.S.A. 44-510d; K.A.R. 51-7-8(b)(3).

While the Board in *Biggs* erroneously ruled that the $50,000 limitation in K.S.A. 44-510f(a)(4) applies to all permanent partial general disabilities and all scheduled injuries listed in K.S.A. 44-510d, the only issue before the Board in *Biggs* was whether K.S.A. 44-510f(a)(4) applied to the permanent partial general disability arising from the loss of the use of Biggs' shoulder.

The Board's decision in the case now before us begs the following question: If the $50,000 compensation cap in K.S.A. 44-

510f(a)(4) applies to both scheduled and nonscheduled injuries, then what type of claims are subject to the $100,000 compensation cap in K.S.A. 44-510f(a)(3)? The legislature could have rewritten K.S.A. 44-510f(a)(3) when it enacted K.S.A. 44-510f(a)(4) to make the distinction clear. Instead, it left the general language "for permanent or temporary partial disability, including any prior temporary total, permanent total . . . paid or due" in K.S.A. 44-510f(a)(3). Therefore, the only reasonable interpretation of the statute is that K.S.A. 44-510f(a)(4) is limited to those few cases in which a claimant does not suffer an injury that causes the claimant to lose at least a week's time from work, but rather causes a "functional impairment only." If there is an injury which prevents the claimant from working for at least a week, then the claimant is also entitled to TTD payments under K.S.A. 44-510c(b)(1), in which case the $100,000 compensation cap in K.S.A. 44-510f(a)(3) applies.

*Conclusion*

When construing statutes to determine legislative intent, an appellate court must consider various provisions of an act *in pari materia* with a view to reconciling and harmonizing the provisions if possible. *Nistler v. Footlocker Retail, Inc.*, 40 Kan. App. 2d 831, 839, 196 P.3d 395 (2008). In doing so, we conclude that the $50,000 benefit cap in K.S.A. 44-510f(a)(4) does not apply to Roberts because he was paid TTD for a healing period (as permitted by K.S.A. 44-510d and K.S.A. 44-510c) in addition to the maximum number of weeks for his amputation. Further, his award was not based on "functional impairment only." Rather, the $100,000 cap in K.S.A. 44-510f(a)(3) applies because it relates to cases in which "permanent or temporary partial disability, including any prior [TTD benefits are] . . . paid or due."

Accordingly, we conclude that the Board erred in applying the $50,000 compensation cap to Roberts' award of benefits. We reverse and remand with directions for entry of an award consistent with this opinion.